Mary Virginia OXENDINE, Appellant,

v.

MERRELL DOW
PHARMACEUTICALS,
INC., Appellee.

No. 83–1055.

District of Columbia Court of Appeals.

Argued Feb. 5, 1985.

Decided March 25, 1986.

As amended June 2, 1986.

---

* Associate Judge Nebeker would grant rehearing.

** Associate Judge Ferren has recused from par-
ticipating in this case.

Barry J. Nace, with whom Thomas H. Tate, Washington, D.C., was on brief, for appellant.

Sidney G. Leech, with whom Daniel W. Whitney, Baltimore, Md., and Mark L. Austrian, were on brief, for appellee.

Jeffrey Robert White, Washington, D.C., David S. Shrager, Philadelphia, Pa., Robert Cadeaux, and Jacob A. Stein, Washington, D.C., filed a brief for amici curiae, Ass'n of Trial Lawyers of America and Ass'n of Plaintiffs' Trial Attys. of Metropolitan Washington.

Before PRYOR, Chief Judge, TERRY, Associate Judge, and PAIR, Senior Judge.

TERRY, Associate Judge:

In this product liability case, appellant seeks reversal of an order of the trial court setting aside a jury verdict in her favor. She contends that there was sufficient evidence to send the case to the jury, and that the court therefore erred in entering a judgment notwithstanding the verdict. In addition, she argues that the court abused its discretion by ordering a new trial in the alternative because the verdict was not against the great weight of the evidence. We agree with both contentions, reverse the judgment, and remand the case with directions to reinstate the verdict and proceed to trial on appellant's claim for puni-

tive damages, which has not yet been tried.[1]

## I

On January 25, 1971, appellant was born with a shortened right forearm and only three fingers on her right hand. Those fingers were fused together.

Appellant, through her parents, filed a complaint in the Superior Court on February 1, 1982, alleging that her birth defects were caused by her mother's use during pregnancy of a prescription drug manufactured by appellee. The drug, known as Bendectin, was designed to alleviate the nausea which commonly accompanies pregnancy. The complaint stated five counts against appellee, alleging negligence, breach of express warranty, breach of implied warranty, strict liability, and misbranding under the Federal Food, Drug, and Cosmetic Act. It sought ten million dollars in compensatory damages and ten million dollars in punitive damages.[2]

After hearing the testimony of eighteen witnesses in the course of a three-week trial, the jury awarded appellant $750,000 in compensatory damages. Appellee then filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court granted both parts of the motion after a hearing, stating in an order the basis of its decision:

> In support of her case to establish proximate cause, plaintiff relies on four principal grounds. The first is the structural activity of Bendectin which included an antihistaminic component, together with the awareness that certain antihistamines have been determined to be teratogenic in certain animals. Plaintiff also relies on the animal or *in vivo* studies. The third ground involves the *in vitro*

studies performed at the National Institutes of Health. Finally, plaintiff relies on human epidemiological data.

> It is clear to the Court from review of the evidence adduced at the trial of this action that no conclusion one way or another can be drawn from any of the above relied upon bases, respecting whether Bendectin is a human teratogen. And it is also clear from the evidence that plaintiff has failed to prove that use of Bendectin by her mother proximately caused her birth defect.

This appeal followed.

## II

■ A judgment notwithstanding the verdict is proper only in "extreme" cases, in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party. *District of Columbia v. Cooper*, 445 A.2d 652, 655 (D.C.1982) (en banc); *accord, e.g., Lewis v. Washington Metropolitan Area Transit Authority*, 463 A.2d 666, 669 (D.C.1983) ("Where the evidence is such that reasonable persons could differ, the issue is properly put before the jury"); *Washington Metropolitan Area Transit Authority v. Jones*, 443 A.2d 45, 49 (D.C.1982) (en banc). We have often stressed that cases "in which only one conclusion reasonably could be drawn from the evidence, and in which negligence ... and proximate cause will not be questions of fact for the jury," are "unusual" cases. *Rich v. District of Columbia*, 410 A.2d 528, 532 (D.C.1979) (citations omitted); *see District of Columbia v. Cooper, supra,* 445 A.2d at 655 n. 3. On appeal, this court must apply the same standard as the trial court. *See District of Columbia v. Cassidy*, 465 A.2d 395, 397 (D.C.1983); *Faniel v.*

---

1. By a pretrial order, the court ruled that the claims for compensatory and punitive damages would be tried separately.

2. Appellant's complaint included an additional claim against the Upjohn Company because her

mother had also taken Provera, a prescription drug manufactured by Upjohn to prevent miscarriages. This claim, however, was settled before trial, and Upjohn dropped out of the case.

*Chesapeake & Potomac Telephone Co.*, 404 A.2d 147, 150 (D.C.1979). We must be particularly cautious about setting aside jury verdicts in cases, such as this one, which present difficult medical issues of causation, with expert testimony going both ways.

> Judges, both trial and appellate, have no special competence to resolve the complex and refractory causal issues raised by the attempt to link low level exposure to toxic chemicals with human disease. On questions such as these, which stand at the frontier of current medical and epidemiological inquiry, if experts are willing to testify that such a link exists, it is for the jury to decide whether to credit such testimony.

*Ferebee v. Chevron Chemical Co.*, 237 U.S. App.D.C. 164, 169, 736 F.2d 1529, 1534, *cert. denied,* —— U.S. ——, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

██ The transcript of the hearing on the motion for judgment n.o.v. helps to clarify what the trial court meant when it said in its order that "no conclusion" could be drawn from the evidence presented at trial. Dr. Alan Done, appellant's sole causation witness, had testified that no conclusion about Bendectin's effect on humans could be drawn from any of the four types of scientific data upon which he had principally relied when each type was considered separately from the others. The court focused on this fact and concluded that if each type of data, viewed in isolation, was not sufficient to prove that Bendectin caused birth defects, then all of them taken together could not prove it either. In so ruling, the trial court erred.

### III

Dr. Done relied on four kinds of evidence in reaching his conclusion that Bendectin

caused appellant's birth defects: (a) structure-activity information, (b) *in vivo* studies, (c) *in vitro* studies, and (d) epidemiological studies. We shall discuss each in turn.[3]

### A. *Structure-activity information*

The first category of data upon which Dr. Done based his opinion involved what he termed the "structure-activity" of Bendectin. He explained that pharmacologists are "frequently able ... to look at the structure [of a chemical compound] and predict what kind of activity that compound will have. And one of the jobs of pharmacology is to try to find that out, because *that is how we design drugs to do certain jobs.*" Dr. Done said that the type of "activity" or function that a drug performs usually "has a bearing on the issue of ... teratogenicity"; some antihistamines, for example, have been found to have teratogenic effects. One of the three components of Bendectin, doxylamine succinate, is an antihistamine.[4] Dr. Done testified that it is a known teratogen for some animals and that it is suspected of being a human teratogen as well.

Appellee correctly states in its brief that "[c]onsidered alone, the structure-activity of Bendectin did not provide a basis for Dr. Done to conclude that Bendectin was a teratogen." But Dr. Done did not consider it alone, as he made clear before he even began to discuss Bendectin's structure-activity. On direct examination he was asked, "So you can't just take the structure by itself and make a determination [as to Bendectin's teratogenicity]?" He responded, "That's right. Never can you take one and say it will not be." On cross-examination he said the same thing. Dr. Done was asked, with regard to "the chemical activity

---

**3.** Dr. Done testified as an expert in the field of teratology, which is, broadly speaking, the study of birth defects and malformations. The admissibility of Dr. Done's testimony is not at issue in this case. Appellee contests its sufficiency to prove causation, but concedes that it was admissible.

**4.** A single dose of Bendectin contains ten milligrams each of doxylamine succinate, dicyclomine hydrochloride, and pyridoxine hydrochloride.

and chemical structures, those alone wouldn't enable you to reach an opinion on what caused Mary Virginia Oxendine's birth defect, would they?" He answered, "Not alone, no."

At the hearing on the motion for judgment n.o.v., however, the court recalled Dr. Done's testimony on the structure-activity of Bendectin somewhat differently: "he told me that ... no conclusions can be drawn because Bendectin has an antihistamine in it, and it proved to be teratogenic in animals, yet no conclusions may be drawn, and yet he said, however, that [this information is] helpful." The court's recollection of the testimony was unfortunately flawed. Dr. Done did not say that "no conclusions" could be drawn from the structure-activity information. On the contrary, he testified that the information provided a "clue" about Bendectin's possible teratogenicity, which helped him to reach his final opinion in the case. He specifically said that teratologists generally rely on such data in combination with *in vitro, in vivo,* and epidemiological studies in reaching conclusions regarding the teratogenicity of a substance; "the whole collection is what is generally used."

### B. *In vivo studies*

Dr. Done next turned to the *in vivo* (animal) studies relating to Bendectin. He first discussed a study entitled "Reproductive Study of Offspring of Bendectin-Treated Dams," which was conducted by appellee and reported by a Dr. Staples. The study was designed to discover whether Bendectin would cause birth defects in the offspring of female rabbits. Dr. Done quoted the pertinent findings and conclusions of Dr. Staples:

The limb alterations observed following Bendectin administration to female rabbits during gestation are considered to have been of no consequence in view of the mildness of the change and in view of its presence among the kits of controlled females.

The sternal changes noted involving shifting ossification [bone formation] centers by past experience could point to the possibility of severe alterations should the dosage be increased above the levels employed here.

This is of particular importance in view of the fact that that type of change was noted only at the highest dose administered.

This possibility can be answered only if further experimentation employing increased dosage is conducted. Such experimentation would at least provide additional information concerning the significance of the abortions seen in this study following Bendectin administration to the rabbit.

Dr. Done said that this study raised a "suspicion" of the teratogenicity of Bendectin which could be resolved only by further studies. Because appellee conducted no further studies, Dr. Done concluded that the Staples study must therefore be viewed as "positive." [5] With regard to the "sternal changes" which Dr. Staples found, Dr. Done testified that the study could not be viewed as negative because the changes were found only at the highest dose used, which was not the highest dose possible. Teratologists, he said, use doses which fall just short of the amount which would start making the mothers ill. They then look for a dose-response relationship in which the

**5.** Appellee asserts in its brief that further studies were in fact conducted. Those later studies, however, involved a two-ingredient form of Bendectin, whereas appellant's mother took the three-ingredient form. Dr. Done was therefore correct when he said that there were no follow-up studies, at least as to the form of Bendectin at issue in this case. Even Dr. Raymond Pogge, who created Bendectin for appellee by combining three separate chemicals, conceded that, because of drug interreactions, one cannot predict what effect such a combination will have by looking at its individual ingredients; one must study the drug in its combined form in order to determine its effect.

number of effects increases with the dosage. Such a relationship helps to demonstrate that the effect is drug-related. The Staples study, however, was lacking the proper dose levels. Dr. Done also noted that the "abortions" mentioned by Dr. Staples (*i.e.*, spontaneous abortions or miscarriages) could have occurred because "the babies were malformed and therefore couldn't survive . . . ."

Although the principal *in vivo* study on which Dr. Done relied was the one reported by Dr. Staples, he testified that two other *in vivo* studies strengthened his opinion that Bendectin is a teratogen. One was conducted by a Dr. Roll to test the effects of doxylamine, one of Bendectin's components, on mice and rats; the other was by a Dr. Hendricks and dealt with the effects of Bendectin on monkeys. Dr. Done did not discuss these studies at length, but he did say that "they showed in my opinion evidence of teratogenicity in those particular species and that would just be further evidence of the potential of the drug to produce defects."

As with the other types of scientific data on which he relied, Dr. Done readily acknowledged that he could not conclude that Bendectin was a teratogen on the basis of the *in vivo* studies alone. In this regard he testified on cross-examination:

> Q. Doctor, the observations of what is happening in people who receive a drug and to their offspring is crucial in getting what in the last analysis is the only meaningful answer whether the drug causes defects in people or not; wouldn't you agree with that?
>
> A. The only definitive answer in terms of absoluteness in humans, yes.

\* \* \* \* \* \*

> Q. Now, any time you have both human studies and animal studies, presuming that they are both properly performed, the human studies would be more valid, more reliable, wouldn't they?

> A. Well, it depends on how well performed they are compared to animal studies. In terms of pinning it down to the human being, if the studies are well performed, they would have greater meaning.

\* \* \* \* \* \*

> Q. Now, in studies with human beings as distinguished from studies with animals, it is much more difficult to get perfect controls; is that correct?
>
> A. Yes.
>
> Q. And that is because animals can be kept in the same environment, given the same food and observed very closely; is that correct?
>
> A. That is part of the reason, yes.
>
> Q. You can control their breeding?
>
> A. That's right.
>
> Q. Whereas in human beings, they are much more different, much more difficult to control even if they are on a study; is that correct?
>
> A. That's right.

\* \* \* \* \* \*

> Q. Doctor, isn't it a fact that you cannot determine teratogenicity from animal studies?
>
> A. You can determine teratogenicity in the human being from animal studies.
>
> Q. But there is no direct correlation between the two?
>
> A. Well, there is a direct correlation . . . in the sense that no known human teratogen to my knowledge has failed to be teratogenic in at least one species of experimental animal.

Dr. Done plainly did not state that *in vivo* data are useless, as the trial court apparently believed. Dr. Done acknowledged that, in theory, human studies may be better than animal studies for predicting a drug's effect on humans, but he also pointed out that animal studies have many advantages over human studies because

better controls are possible. Moreover, he specifically said that "[y]ou can determine teratogenicity in the human being from animal studies." Dr. Done did concede that "[t]he fact that [a substance] is teratogenic in a species of animal does not necessarily mean that it will be in humans as far as we know." The extent of that concession, however, was simply that one cannot conclude that a drug is a human teratogen on the basis of animal studies *alone.* Dr. Done did not attempt to draw such a conclusion. Even Dr. William Scott, one of appellee's expert witnesses, testified that animal studies must not be considered alone, but in combination with all other available data, to determine the teratogenicity of a substance. That is precisely how Dr. Done arrived at his conclusion that Bendectin was a teratogen, as his testimony made very clear.

### C. *In vitro studies*

Next, Dr. Done turned to the *in vitro* data on the teratogenicity of Bendectin. He explained that *in vitro* means "in glass," and that *in vitro* studies are those which are performed in a test tube. Such studies are particularly valuable, he said, because they allow scientists to focus on a specific effect. For example, to determine whether a drug can cause limb-shortening birth defects, limb bud cells of animal embryos (which eventually form the limbs of animals) can be separated from the rest of the embryo, placed in a test tube, and watched to see if their development is thwarted by the drug.

Dr. Done relied principally on an *in vitro* study performed by a Dr. Hassell. In that study Dr. Hassell observed that Bendectin interfered with the growth and develop-ment of limb bud cells. This observation led Dr. Done to conclude that the study "clearly indicates the potential for teratogenicity is there with regard to limb defects because the focusing that was done in this instance was to focus down on limb bud cells individually and grow them as

pure things in culture. When it could be shown that Bendectin interfered with their growth and development, that, of course, indicates that the potential is there."

Considering the *in vitro* evidence in combination with the other data, Dr. Done testified that in his opinion Bendectin caused appellant's birth defects. Here again, Dr. Scott, appellee's expert witness, testified that *in vitro* studies play a role in the determination of whether a substance is a teratogen. Such evidence, he said, must be considered in light of other available data in reaching an opinion on the teratogenicity of a substance. Dr. Done did not testify otherwise.

### D. *Epidemiological studies*

Finally, Dr. Done turned to the epidemiological data. Epidemiology is the study of the frequency of disease in human populations and the way in which that frequency varies from one population to another. Like animal studies, epidemiological data are used to determine whether there is a positive correlation between the use of a substance and the appearance of any subsequent illness.

Dr. Done relied principally on a study conducted by two employees of appellee, Drs. Bunde and Bowles. Their study analyzed certain data provided by obstetricians in different parts of the United States and Canada concerning 2218 pairs of their women patients. Drs. Bunde and Bowles concluded that these data did not show a statistically significant association between Bendectin and birth defects.

Dr. Done reexamined the same data and came to a different conclusion. Initially he found fault with the methodology used by Drs. Bunde and Bowles, stating that it did not comport with accepted epidemiological standards. He also pointed out that there were inadequate controls because many women in the control group could have been exposed to Bendectin. Since Bendectin can be purchased without a prescription

in Canada, the Canadian obstetricians reporting their findings may not have known whether some of the women in the control group had taken it. Dr. Done therefore excluded the Canadian pairs from the data. He also found numerous errors in the raw data and excluded more pairs to deal with those problems.[6] In the end he calculated that the "relative risk" of the study was between 1.3 and 1.8, depending on whether certain data were Canadian or American. He explained the significance of these figures:

> Relative risk just means the likelihood of getting a defective child in this case as a result of an association with the taking of Bendectin as opposed to not taking Bendectin.

> 1.8 means the woman is 80% more likely or almost twice as likely, in other words, to have a malformed baby if she is in the Bendectin group than in the control group.

> Or if the figure is correct, 1.3, that means 30% greater likelihood. Whereas before, the original results suggested that she was 40% less likely to have an abnormal baby if she received Bendectin than if she didn't.

Dr. Done testified that the Bunde-Bowles study, taken together with the rest of the available data, supported his conclusion that Bendectin caused appellant's birth defects. He identified more than twenty other epidemiological studies which he had reviewed and analyzed in his own separate study of the literature on Bendectin and its components. He also referred to an internal memorandum of appellee entitled "Bendectin and Congenital Malformations," which reported that 48 percent of all Ben-

dectin-related defects observed in a study were limb defects. Finally, Dr. Done noted that in a memorandum written by an employee of appellee, which was admitted into evidence over appellee's objection, there appears the statement that "Bendectin is not an obligatory teratogen as Thalid [omide] (for example)." Dr. Done explained that an obligatory teratogen is one which almost always causes birth defects, and that the author of this statement would not have made it unless he or she believed that Bendectin was a teratogen, but not as "flagrant" or severe as Thalidomide.[7]

Dr. Done was on the witness stand for three and a half days. His testimony fills almost 600 pages of transcript. Although he was vigorously and exhaustively cross-examined by very able counsel, he did not waver from his opinion that Bendectin had caused appellant's birth defects. Throughout his testimony he repeatedly stated that this opinion was based not on any single study or type of evidence, but on four different types of scientific data viewed in combination. He conceded his inability to conclude that Bendectin was a teratogen on the basis of any of the individual studies which he discussed, but he also made clear that all of these studies must be viewed together and that, so viewed, they supported his conclusion. To argue on the basis of his concession, as appellee now does, that there was no factual support for his opinion simply ignores the rest of his testimony.

### E. *Appellee's evidence*

 Dr. Brian MacMahon was appellee's principal witness on epidemiology and statistics. He testified that in evaluating the data on which an epidemiological study is based, one must first calculate the "rela-

---

**6.** The decision regarding what data to consider and what to exclude is apparently left primarily to the discretion of the expert. In this case data were excluded by both appellant's and appellee's expert witnesses. Although they often disagreed sharply with respect to when it was reasonable to disregard data, they all agreed that it was generally proper to do so.

**7.** Dr. Done also noted that appellant was exposed to Bendectin during the critical period in which her limbs were developing. This made it more likely, he said, that Bendectin caused her birth defects.

tive risk" of the substance tested. Next, one must determine the "confidence interval" for the study, which sets the range within which the relative risk would fall if the study were repeated many times. Finally, one must look to see if the number "1" falls within the confidence interval. If so, the results of the study are essentially meaningless; if not, the study shows a statistically significant relationship between the substance tested and the effects observed.

Dr. MacMahon then reviewed a number of epidemiological studies on Bendectin. Many of them had a relative risk higher than 1, which meant that the risk of having a baby with a birth defect was higher for those mothers who took Bendectin than those who did not. Nevertheless, Dr. MacMahon believed that these studies were meaningless because the number "1" fell within the confidence interval of each of the studies. He therefore concluded that Bendectin was not responsible for the birth defects observed in the studies and, moreover, that it did not cause appellant's birth defects. Appellee relies principally on Dr. MacMahon's testimony and on similar statements by its other expert witnesses in arguing that causation cannot be established without evidence of a statistically significant association between Bendectin and birth defects. There are at least three reasons why this argument lacks merit.

First, Dr. MacMahon conceded that there were in fact several studies showing statistically significant associations between Bendectin and various types of birth defects. In a study by a Dr. Cordero, for example, Dr. MacMahon noted that the relative risk for one type of limb reduction effect was statistically significant. The relative risk was 3.88, and the confidence interval did not include the number "1." Other defense witnesses also testified to such statistically significant associations. Therefore, even assuming that a study must be deemed meaningless whenever the number "1" falls within its confidence interval, the jury was made aware of several meaningful studies on which it could base a finding of causation.

Second, appellant's rebuttal witness, Dr. Shanna Swan, an expert in biostatistics and epidemiology, testified that the mere fact that the number "1" falls within the confidence interval does not invalidate the study. She cited as an example an epidemiological study by a Dr. Smithells, in which the confidence interval was from 0.71 to 2.61, and the relative risk was 1.36. Dr. Swan testified that the relative risk calculation is the "best estimate of the true situation based on [these] data...." A relative risk of 1.36 means that women who take Bendectin have a 36 percent higher risk of having a baby with a birth defect than those who do not. Confidence intervals, she said, are used to predict the range in which the relative risk would fall if the study were repeated several times. Thus, in the Smithells study, "the data [are] consistent with the relative risk being as high as 2.61," which means that women who took Bendectin would have a 161 percent higher risk of having a baby with a birth defect than those who did not take Bendectin. Dr. Swan's testimony thus contradicted that of Dr. MacMahon on the question of whether many of the studies which he rejected could be relied upon as evidence that women exposed to Bendectin had a higher risk of giving birth to babies with birth defects. That contradiction was properly left to the jury to resolve.

Finally, Dr. MacMahon conceded that statisticians must be careful to weigh other evidence and not to apply their rules rigidly and blindly. On cross-examination, he agreed with Dr. Byron Brown, whom he recognized as an authority on the subject:

Q. Do you agree with [Dr. Brown], if the scientist is to go further than reporting his set of data, discussing it as fully as possible and relating it to the body of current knowledge, if he is to regard

himself as a decision maker, then he must consider more than error rates? Do you agree with that?

A. Yes.

Q. He must weigh past evidence in with the data he has accumulated and he must weigh the penalties or costs involved in making the various types of error. Do you agree with that?

A. Yes.

Q. And Doctor, one of the things you have to consider, then, when you come up with your statistics is what happens if you are wrong. You have to consider that risk, don't you, as a biostatistician?

A. Yes.

Q. And if the studies that show a relative risk as Smithells did at 36 percent greater chance of a defect, Mitchell, 50 percent, and the other ones that we referred to were right with that relative risk and you are wrong saying they are statistically insignificant, and Bendectin is in fact a teratogen, then the risk is that children are going to be born with limb defects of mothers who take Bendectin, isn't that right?

A. That's very hypothetical, but yes.

### F. *Conclusion*

Although the trial in this case was long and the evidence complex, the issue before the jury was a straightforward one: did Bendectin cause appellant's birth defects? Expert witnesses testified at length on both sides of that issue. Not surprisingly, their testimony revealed a disagreement as to how the epidemiological and other data should be interpreted. "The case was thus a classic battle of the experts, a battle in which the jury must decide the victor." *Ferebee v. Chevron Chemical Co., supra,* 237 U.S. App. D.C. at 170, 736 F.2d at 1535 (citation omitted). The trial court, however, granted appellee's motion for judgment notwithstanding the verdict on the ground that appellant's causation expert

admitted in his testimony that each of the studies on which he relied could not, *by itself,* support a finding of causation. Where the court erred was in failing to consider the same expert's testimony that all of the studies, *taken in combination,* did support such a finding, as he carefully and repeatedly explained.

██ In ruling on a motion for judgment n.o.v., the court must view the evidence as a whole, not in fragments. Like the pieces of a mosaic, the individual studies showed little or nothing when viewed separately from one another, but they combined to produce a whole that was greater than the sum of its parts: a foundation for Dr. Done's opinion that Bendectin caused appellant's birth defects. The evidence also established that Dr. Done's methodology was generally accepted in the field of teratology, and his qualifications as an expert have not been challenged. Because he fully explained to the jury that his opinion was based on *all* of the studies, we cannot say that no reasonable juror could reach a verdict in favor of appellant. Hence we must reverse the order granting a judgment n.o.v.

### IV

█ Appellant also contends that the court abused its discretion by ordering a new trial in the alternative on the ground that the verdict was against the weight of the evidence. We agree.

A ruling on a motion for new trial is committed to the sound discretion of the trial court and will be reversed on appeal only if that discretion has been abused. *Rich v. District of Columbia, supra,* 410 A.2d at 535; *Johnson v. Bernard,* 388 A.2d 490, 491 (D.C.1978); *Baber v. Buckley,* 322 A.2d 265, 266 (D.C.1974). This discretion is appropriately placed because the trial court, unlike an appellate court, has had an opportunity to see and hear the witnesses at first hand. *Rich v. District of Columbia, supra,* 410 A.2d at 535.

Our scope of review is especially narrow when the trial court has denied a motion for new trial, thereby sustaining the jury's verdict. In such a case, "the trial court's unique opportunity to consider the evidence in the context of a 'living trial' coalesces with the 'deference properly given to the jury's determination of such matters of fact as the weight of the evidence,' so as to favor restricted appellate review." *Id.* (citation omitted). However, "when the jury has exercised its factfinding function, and the trial judge sets that body's decision aside by granting a new trial, the two factors favoring limited review are in opposition, not harmony." *Id.* (citations omitted). In that situation

> the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to jury trial.

*Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 90 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960), quoted in *Rich v. District of Columbia, supra,* 410 A.2d at 536. Consequently, when the court has merely reexamined the evidence and reached a decision contrary to that of the jury, we must review the new trial order with great care.

■ In this case, the trial court granted appellee's alternative motion for new trial on the ground that the "jury verdict [was] against the great weight of the evidence." Although the court did not explain its ruling further, it appears to have been based on the same reasoning that led to the court's flawed ruling on the motion for judgment n.o.v., namely, that Dr. Done's testimony must be discounted because he could not base a finding of teratogenicity on any of the individual studies on which he relied. Having given the court's new trial order the close scrutiny which the case law commands, we are convinced that the court erred in concluding that the verdict was against the weight of the evidence.

Dr. Done testified that on the basis of the structure-activity, *in vivo, in vitro,* and epidemiological data, viewed in combination, he had formed an opinion that Bendectin was a teratogen and that it had caused appellant's birth defects. Although appellee put a dozen expert witnesses on the stand, not one of them contradicted Dr. Done's opinion. Several of appellee's experts conceded that Dr. Done's methodology was proper, but not one of them followed it. Not one testified that on the basis of the four types of evidence reviewed by Dr. Done, taken together, Bendectin could not be regarded as a teratogen. Instead, appellee relied almost entirely on the epidemiological data because it believed that Dr. Done had conceded away his case. Appellee reasoned there was no need to refute Dr. Done's testimony because Dr. Done had done that job himself. As appellee states in its brief on appeal:

> Appellant contends that no Merrell Dow expert expressed an opinion based upon all of the factors considered by Dr. Done, namely, the "structure activity" of Bendectin, the animal *in vivo* and *in vitro* studies, the human epidemiological data and drug experience reports, and therefore his opinion is somehow unrefuted and unrebutted.

> No Merrell Dow expert relied upon all of the so called data Dr. Done relied upon for one simple reason—the basis of this opinion was speculative or nonexistent. By his own testimony Dr. Done conceded away the grounds for his opinion.

Appellee not only failed to refute Dr. Done's opinion directly, but offered little evidence to discredit any of the four bases of that opinion. First, with regard to Dr.

Done's structure-activity analysis, appellee called Dr. Frank Palopali, the head of its chemical department.. Dr. Palopali sketched the chemical structures of several antihistamines and concluded that they differed. However, he did not contradict Dr. Done's testimony that antihistamines are often teratogens, that Bendectin in fact contains an antihistamine which is a known animal teratogen and a suspected human teratogen, and that such information may be relied upon, in part, as a basis for concluding that Bendectin is a human teratogen.

Second, with respect to the *in vivo* studies, only one of appellee's twelve witnesses, Dr. William Scott, testified about them, and he did so only briefly. When asked whether the Roll study showed that Bendectin had caused birth defects, he simply relied, "No, it did not have any effect." Asked whether eight other *in vivo* studies involving a two-component form of Bendectin showed that it caused birth defects, he responded, "No, they do not." Appellant's counsel objected to this last question on relevancy grounds because appellant's mother had taken Bendectin in its three-component form, but the court overruled the objection.[8]

Third, with respect to the *in vitro* studies, Dr. Scott was again the only one of appellee's witnesses to say anything on the subject. He testified that one major drawback of *in vitro* testing is that it is done in a static system without live animals. Ordinarily, he said, when a drug is taken by an animal and absorbed into its blood stream, enzymes break the drug down into metabolites, which are excreted. Consequently, the live embryo is exposed to only a fraction of the amount that is given to the animal. Dr. Scott did not explain, however,

whether that problem could be resolved by exposing *in vitro* embryos to less of the drug or by reducing the time of their exposure. Moreover, he did not contradict Dr. Done's testimony that *in vitro* tests are better in some ways than *in vivo* tests, especially because they allow scientists to focus on a particular aspect of an animal without any outside interference. Dr. Scott also conceded that *in vitro* tests play a useful role in determining whether a substance is a human teratogen. In addition, Dr. Scott did not refute Dr. Done's conclusions regarding Dr. Hassell's *in vitro* study, and he conceded that the study was done properly. Referring to Dr. Hassell and his study, Dr. Scott testified, "I'm not an expert on that particular technique, but he is, and I would presume that they are done technically correctly."

Finally, with respect to the epidemiological data, appellee called a number of expert witnesses. Dr. MacMahon explained the background necessary to understand his testimony and discussed a number of studies. Appellee then called several of the authors of studies relied upon by Dr. MacMahon. They all conceded that there were studies which had both an increased and a decreased relative risk for Bendectin users. Their testimony made clear that the relative risk calculated for a particular study was not carved in stone. For example, Dr. Jorge Michaelis calculated the relative risk for his study as 0.95 (showing a decreased risk), but he said that it could also be computed as 1.37 (indicating an increased risk). Appellee's expert testimony in this area was met head-on by appellant's rebuttal witness, Dr. Swan. She testified that appellee's experts had incorrectly dismissed many studies as meaningless because the number "1" fell within the

8. Dr. Done had testified earlier that he would not consider the studies of the two-component form because it was different from the three-component form suspected of being a teratogen in this case. Even Dr. Pogge, the creator of Bendectin, acknowledged in his testimony that

there is an entire specialty in medicine dealing with the interreaction of ingredients in drug compounds, and that the effect of a such a compound cannot be predicted simply by looking at its individual ingredients. See note 5, *supra*.

confidence interval. Moreover, she regarded Dr. MacMahon's calculations in which he added the relative risks of several studies as "very improper." She said that because the "studies are not equal in validity," what he did was similar to adding "apples and oranges."

It is clear from a review of the record that the verdict was not against the weight of the evidence. There was evidence on both sides of nearly every issue, and it was fairly evenly weighted. Taking all the testimony into account, we hold that the trial court abused its discretion in granting a new trial on the ground that the verdict was against the weight of the evidence. *See Rich v. District of Columbia, supra,* 410 A.2d at 535–536.

## V

Appellee makes several additional arguments in support of the trial court's new trial order. They are all without merit.

■ First, appellee contends that the court properly granted a new trial because it had erred in admitting Dr. Hassell's *in vitro* study into evidence; the study should have been excluded, says appellee, because it was hearsay. We reject this argument because the record shows that appellee waived its right to make a hearsay objection to the admission of this or any other study relied upon by Dr. Done at trial. When appellee's counsel sought the admission of a study relied upon by one of appellee's experts, appellant's counsel objected on the ground that the study was hearsay, but the court overruled the objection, saying:

> THE COURT: ... [I]t was understood from the very beginning that instead of bringing in all these authors of studies that were going to be relied upon in the testimony, that you would only have to bring the authors that were challenged....

9. Even if we were to hold that the Hassell study was inadmissible, its admission would surely be

Now, those are the ground rule[s] that I concluded have been set up in this case.

We are satisfied that appellee waived any right it may have had to object to the admission of the Hassell study on hearsay grounds.[9]

■ Second, appellee contends that the court erred in allowing the jury to hear Dr. Swan's rebuttal testimony. There is no merit to this claim. The scope of rebuttal testimony is committed to the sound discretion of the trial court, *Adams v. United States,* 379 A.2d 961, 965 (D.C.1977), and in this case the court carefully limited the testimony to those issues which were first raised by appellee in its defense. *See Robinson v. Parker,* 11 App.D.C. 132, 138 (1897). It plainly did not abuse its discretion.

■ Third, appellee claims that the court erred in preventing it from cross-examining Dr. Done about certain testimony he had given before the Food and Drug Administration. On redirect examination, Dr. Done was discussing "clustering," which he explained "refers to the occurrence ... [of a] defect with a rate very much higher than one expects." When asked whether he had previously stated his view about clustering, he replied, "Well, yes, I have had that viewpoint for a very long period of time and have testified to that before hearings at the Food and Drug Administration." Somehow appellee concludes that this statement "left the clear impression that Dr. Done's conclusions were agreed to by the FDA." We cannot agree. Dr. Done merely said that he had testified before the FDA. If any unwarranted impression was left at all thereafter, it was due to appellee's re-cross-examination of Dr. Done:

> Q. Doctor, you testified on redirect examination that you testified before the Food and Drug Commission [*sic*] in the

harmless error because it was just one small piece of the evidentiary mosaic.

maternity and fertility health drug advisory committee; is that correct?

A. Well, most of that characterization is yours but that is correct. Yes.

Q. Is that who you testified before?

A. If that is who it was, yes.

Q. But that advisory committee did not accept your testimony, did not follow your opinion, did they?

A. Well, to some degree they did, yes.

Q. And in fact they indicated—

THE COURT: We are not trying that.

MR. NACE [counsel for appellant]: Objection.

THE COURT: Sustained.

To the extent that Dr. Done's testimony on this point was prejudicial, the prejudice was caused by appellee's own questioning. Dr. Done never said anything about the FDA's acceptance of his views until asked by appellee's counsel. In any event, the court quite properly cut off counsel's line of questioning because it was irrelevant. The advisory committee may have had a number of reasons for accepting or rejecting his testimony that would have no bearing on this case. Relevancy rulings are committed to the sound discretion of the trial court, e.g., Jones v. Prudential Insurance Co., 388 A.2d 476, 481–482 (D.C.1978), and we find no abuse of discretion here. We cannot sustain the granting of a new trial on this ground.

██ Fourth, appellee contends that the court properly granted a new trial because it had erred in not permitting Richard Smith, one of appellee's employees, to testify that Bendectin had been used in more than thirty-three million new therapy starts (prescriptions). Appellee argues that the "fact that Bendectin usage increased at a dramatic rate during a period when the incidence of limb reduction defects remained constant would have shown that Bendectin was not responsible for an increased incidence of birth defects," and

that this was "an important aspect of its defense." We reject this argument because the fact to which Smith would have testified had already been put before the jury by Dr. Charles Epps, one of appellee's witnesses (whom the court warned not to repeat it). Furthermore, very similar testimony was given by Dr. MacMahon, who noted that between 1966 and 1978 there had been a fourfold increase in the issuance of Bendectin prescriptions, but that the overall rate of congenital malformations had declined during that time. On the weight to be given to this information, MacMahon testified, "I would not go so far [as] to say that [Bendectin] does not [cause an increase in defects] because this is a rather indirect kind of evidence. For what it is, it is that." There is thus no substance to the assertion that appellee was "prejudicially prevented from presenting an important aspect of its defense."

Finally, appellee contends that it was unfairly prejudiced by the introduction of evidence regarding errors in the performance of the Bunde-Bowles study, and that the new trial order should be upheld for that reason. Appellee maintains that the attack on the study would have been allowable if Dr. Done had used these errors to show that the study exhibited a "positive causation finding," but that it was improper in this case because Dr. Done conceded that the study was meaningless. Dr. Done made no such concession. On the contrary, he concluded that the Bunde-Bowles study showed that babies who were exposed to Bendectin had a 30 to 80 percent higher risk of birth defects than those who were not. We therefore reject appellee's argument because its premise is refuted by the record.

## VI

For the foregoing reasons we reverse the order from which this appeal is taken. We remand the case to the trial court with directions to reinstate the jury verdict

awarding compensatory damages, and to conduct further proceedings on the issue of punitive damages.

*Reversed and remanded.*