**Anthony RIVERA, Appellant**

v.

**John SCHLICK, Appellee.**

**No. 02–CV–455.**

District of Columbia Court of Appeals.

Submitted Jan. 26, 2005.

Decided Dec. 1, 2005.

---

Michael L. Smith, was on the brief for appellant.

Curt S. Hansen, was on the brief for appellee.

Before TERRY, Associate Judge, and FERREN and STEADMAN, Senior Judges.

TERRY, Associate Judge:

This is a breach of contract case involving three promissory notes. Appellant Rivera appeals from an order denying his post-trial motion for judgment notwithstanding the verdict. He maintains that the trial court erred when it ruled that the loans at issue did not violate District of Columbia usury laws and upheld the jury verdict, and asks this court to overturn that verdict and reverse the subsequent order denying his motion. We affirm.

I

John Schlick filed a breach of contract claim against Anthony Rivera. After a two-day trial, the jury returned a verdict awarding Mr. Schlick damages in the amount of $42,910.26. Counsel for Mr. Rivera immediately made an oral motion for judgment notwithstanding the verdict, which the court denied.[1]

Mr. Schlick, a part-time real estate developer, lent money to Mr. Rivera and his business partners so that they could complete renovations of a house on First Street, N.W.[2] The loan was memorialized in a series of three separate promissory notes. Eventually, Mr. Schlick also assumed payment of certain costs associated with the renovation of the property. Mr. Rivera and Mr. Schlick had previously worked together as real estate agents before venturing independently into real estate development in the District of Columbia. They had known each other for approximately seven years prior to this transaction.

Mr. Rivera purchased the First Street property in February 1998. On January 21, 1999, he executed a promissory note to Mr. Schlick in which he promised to repay $20,500 for a $15,000 loan. Reading from the note while testifying, Mr. Rivera said that the first paragraph of the note referred to "the principal sum of $20,500, including interest," which he understood to mean that the note included both interest and principal.[3] In his testimony, Mr. Schlick conceded that the first note assessed approximately $5,000 in interest (which was included in the repayment sum) and an additional 12% interest levied

---

1. A written motion for the same relief was subsequently filed and was again denied by the court. In its order denying the motion, the trial court ruled that Mr. Schlick was not subject to District of Columbia usury laws because the record was "void of any evidence that [he] was in the business of lending money." The court held that Mr. Rivera had failed to show, as a motion for judgment n.o.v. requires, that no juror could have reasonably reached a verdict for Mr. Schlick.

2. Mr. Schlick testified that, according to his understanding, the property was jointly owned by Mr. Rivera, "his partner [Philip Johnson], and their construction company [M & J Enterprises]," and William Ritchie. The

promissory notes at issue in this case were signed by Mr. Rivera and Mr. Ritchie individually, and by Philip Johnson on behalf of M & J Enterprises (a District of Columbia corporation whose charter had been revoked several years earlier). While Mr. Rivera was also an officer of M & J Enterprises, the instant action only named him individually as a defendant.

3. This first promissory note was introduced into evidence without objection, but it has not been included in the record on appeal. The second and third promissory notes, however, are in the record.

against the repayment sum of $20,500 if it was not repaid within a certain period of time.[4]

About six months later, on July 31, 1999, Mr. Rivera executed a second promissory note to Mr. Schlick for $24,400 without interest. Then, on September 1, 1999, Mr. Rivera executed a third promissory note to Mr. Schlick, in which Rivera promised to pay "FOR VALUE RECEIVED ... the sum of $34,500.00 without interest" (capital letters in original).[5] The note indicates, and the parties agree, that it was intended to supplant the second promissory note entirely. The text of the third note reads in part:

> Borrowers understand and agree that this promissory note is the third of three promissory notes executed by borrowers for the benefit of the Noteholder. By executing this note, the Noteholder hereby cancels the second promissory note executed on or about July 31, 1999, in the amount of $24,500.00.[6] The parties understand and agree that the first promissory note, for $20,500.00 remains in full force and effect and that each note is a separate instrument and obligation. Borrowers understand and agree that their total indebtedness on the two notes ("the combined notes") to the Noteholder is fifty-five thousand dollars ($55,000.00).

While the first note remained payable and unchanged, the principal sum stated in the third note was greater than in the second note, which it replaced.

Mr. Schlick testified that "after the $24,000 note had been written and signed, I found out that Anthony [Rivera] and his partner had not been paying the first trust and that the house was in foreclosure." Thus the difference of approximately $10,000 in principal between the second and third notes reflected the amount that Mr. Schlick paid to Fleet Mortgage Company in order to cancel the foreclosure proceeding.[7] The total due to Mr. Schlick on the combined first and third notes therefore amounted to $55,000.[8] The third note would become due on September 27, 1999, a date chosen to coincide with the anticipated settlement of a contract of sale for the First Street property. In the event that Mr. Rivera failed to pay the debt on time, a 12% annual interest rate would apply thereafter to any unpaid portion. Furthermore, if the profit from the

4. The record does not reveal the exact duration of that repayment period.

5. Mr. Rivera asserts that, contrary to the language of the third note, $34,500 was not transferred at the time the note was executed. At trial he testified that the amount received from Mr. Schlick "was nowhere near $34,000," but that he did not have "a clear accounting of how much money was actually given because it wasn't given to me." This aspect of their dispute is not relevant to the instant appeal.

6. Although the third note states that $24,500 is the amount outstanding from the second note, this figure appears to be incorrect. The text of the second promissory note and Mr. Rivera's testimony both indicate that the second promissory note was for $24,400. Another discrepancy arose in Mr. Schlick's testimony, which was that $24,000 (not $24,400 or $24,500) was the true sum at stake in the second note.

7. Mr. Schlick testified that the third note did not include any carryover of interest from the second note, but only principal. "[I]t didn't include any interest deduction. It included the [principal], and the money that was used to redeem the property from the foreclosure, and that was basically it. I had given up trying to collect interest at that point. I just wanted my money back."

8. Mr. Schlick testified that the total due to him on the two notes was $54,000. This appears, however, to have been a miscalculation that he made as he examined the notes while on the witness stand.

sale of the house was insufficient to satisfy the debt, Mr. Schlick could place a lien on Mr. Rivera's brokerage fees. The third note also granted Mr. Schlick a security interest in the First Street property by means of a deed of trust.

The purpose of these loans was to allow Mr. Rivera and his partners to complete the rehabilitation of their joint investment property, the house on First Street. The contract for the sale of that house, however, did not go to settlement in September because the work was still unfinished. Because Mr. Schlick was no longer willing to advance lump sums of money, he began issuing checks (fifteen in all) or paying cash to individual contractors and other workers to complete the renovations. These additional costs amounted to slightly more than $15,000, bringing the money owed to Mr. Schlick to a total of $71,745.22.

Early in February 2000, Mr. Rivera and his partners finally sold the First Street property. Mr. Rivera waived his brokerage fee, and the profits from the sale, amounting to $38,270.94, were paid to Mr. Schlick. Shortly thereafter, Mr. Schlick brought this action seeking the balance still owed to him under the third note, $33,474.28, plus interest, costs, and fees.

## II

Mr. Rivera argues that the trial court erroneously ruled that the loans in question did not violate District of Columbia laws regulating the lending of money. He specifically contends that Mr. Schlick should be held to be "in the business of lending money," and therefore within the scope of the District's loan shark and usury statutes; thus, he maintains, the jury should have been instructed on the applicability of these statutes. This argument is without merit because it misconstrues the applicable law. The evidence at trial

established that all of Mr. Schlick's loans were made within a short period of time, for the single purpose of completing renovations on the First Street property. Consequently, we agree with the trial court that the loans made by Mr. Schlick were not subject to scrutiny under the District's loan shark and usury laws, and that no juror could reasonably find otherwise. Furthermore, even if those laws did apply, Mr. Rivera has not shown that the interest rate charged exceeded the statutory limits.

### A. The Standard of Review and Applicable Statutes

"A trial court may enter a judgment notwithstanding the verdict 'only when, viewing the evidence and reasonable inferences in the light most favorable to the party who secured the jury verdict, no juror could reasonably reach a verdict for the opponent of the motion.'" *Washington v. Washington Hospital Center*, 579 A.2d 177, 181 (D.C.1990) (citations omitted); *accord, e.g., District of Columbia v. White*, 442 A.2d 159, 163 n. 9 (D.C.1982). Thus a judgment n.o.v. is proper "only in 'extreme' cases," in which no reasonable juror could have reached a verdict in favor of the party that prevailed. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986) (citations omitted). Our inquiry, therefore, must be focused on whether the jury would have had to speculate to reach its verdict. *See Ceco Corp. v. Coleman*, 441 A.2d 940, 944 (D.C. 1982) (on appeal from denial of a directed verdict); *Courtney v. Giant Food, Inc.*, 221 A.2d 92, 93 (D.C.1966) (on appeal from grant of a directed verdict).

This case requires us to examine two statutes, one which prohibits usury and one (commonly known as the loan shark law) which imposes licensing requirements applicable to those in the business of lending money. The two statutes,

"read together, as the lawmakers intended," constitute "a comprehensive code for the business of lending money in the District of Columbia." *Hartman v. Lubar*, 77 U.S.App. D.C. 95, 97, 133 F.2d 44, 46 (1942).

■ The District's loan shark law is not a usury statute but rather a licensing act, imposing restrictions on the lending of sums of money on personal security. D.C.Code § 26–901(a) (2001) provides, in relevant part:

> It shall be unlawful and illegal to engage in the District of Columbia in the business of loaning money upon which a rate of interest greater than 6% per annum is charged on any security of any kind, direct or collateral, tangible or intangible, without procuring [a] license . . . .

Therefore, "[i]f the disputed loan was made by one who was engaging *in the business of lending money* in violation of the law, and if the loan was made in the course of that business, then it constituted an illegal contract." *Hartman*, 77 U.S.App. D.C. at 96, 133 F.2d at 45 (footnotes omitted; emphasis added). Thus an individual in the business of lending money without a license does so illegally, and as a consequence that lender has no recourse to enforce the contract. *Id.*

The usury statute, D.C.Code § 28–3301(a) (2001), states:

[With exceptions not pertinent here,] the parties to an instrument in writing for the payment of money at a future time may contract therein for the payment of interest on the principal amount thereof at a rate not exceeding 24% per annum.

In addition, D.C.Code § 28–3301(c)(1) provides in part:

> It shall be lawful to contract for a rate of interest not exceeding 24% per annum on a loan or financial transaction which is secured directly or indirectly by: (1) a mortgage or deed of trust . . . on residential real property . . . . [9]

### B. The Business of Lending Money

■ The trial court rejected Mr. Rivera's repeated contention that Mr. Schlick was in the business of lending money. In an oral ruling shortly before the case went to the jury, the court said:

> [T]he provisions of Chapter 28 are applicable to the written contract in this particular case, specifically 28–3301(a), which allows parties to enter into a written contract or instrument for the payment of money at a future time and contract for a rate of interest not to exceed 24 percent.

> \*    \*    \*    \*    \*    \*

> I have reviewed the [case of] *Hartman v. Lubar* . . . which focuses on individuals in the business of loaning money.

Mr. Schlick, however, is ineligible under this provision because, as another part of the same subsection makes clear, this statutory exception does not apply when the loan is "secured directly or indirectly by a mortgage or deed of trust on residential real property . . . ." D.C.Code § 28–3301(d)(1). The third note granted Mr. Schlick a security interest in the First Street property by means of a deed of trust.

**9.** If this case involved a first purchase deed of trust, the 24% interest cap would still apply under D.C.Code § 28–3301(b)(1). Mr. Schlick contends that he could legally contract at any rate of interest because he meets the exception to the 24% interest cap under D.C.Code § 28–3301(d)(1)(B), which applies when

> the borrower is an individual, a group of individuals . . . or any other entity, and the loan is made for the purpose of acquiring or carrying on a business, professional or commercial activity[.]

Again, I don't feel that that is what this case is about . . . .

\*　　\*　　\*　　\*　　\*　　\*

We're talking about two real estate developers who entered into this agreement, by the testimony of both parties, in order to renovate and sell a particular property. So I don't feel that the provisions of Section 26–901 . . . or the usury provision defined in 28–3303 [is] applicable.

Nothing in the record leads us to conclude that this ruling was erroneous. While the loans were indisputably made for a commercial purpose, the evidence is clear that Mr. Schlick was not in the business of lending money.[10] He testified that neither he nor his part-time real estate development company was in the business of providing loans to anyone and that this was the "first and last time" that he would do so. Although it is true that Mr. Schlick made several loans to Mr. Rivera, they all arose from a single transaction and had the sole purpose of completing renovations on a single property. There was no contrary evidence to suggest that Mr. Schlick was engaged in the lending of money to anyone other than Mr. Rivera and his associates.

We distinguish the instant case from those involving usurious contracts, which typically concern merchants or others in the business of lending money.[11] *See, e.g., Pazianos v. Schenker,* 366 A.2d 440, 441–442 (D.C.1976) (debtor signed note to secure purchase of house, and noteholders were repeat purchasers of promissory notes who "through the years" had purchased several notes from an intermediary real estate broker engaged in the business of securing second trust financing for prospective homeowners; the court held that an "extension fee" was effectively interest, rendering overall interest usurious); *Fuller v. Universal Acceptance Corp.,* 264 A.2d 506, 508–509 (D.C.1970) (debtor purchased furniture from salesman; loan carried a finance charge held to be usurious); *Beatty v. Franklin Investment Co.,* 115 U.S.App. D.C. 311, 313, 319 F.2d 712, 714 (1963) (debtor bought automobile from salesman who later sold the loan to a finance company; promissory note held to be a cash sale accompanied by a loan charging a usurious interest rate of 50%). Although Mr. Schlick charged an interest rate greater than 6%, a reasonable juror could find—indeed, would necessarily find from the evidence presented—that he was not in the business of lending money, and therefore that his transaction with Mr. Rivera was not within the purview of the loan shark law.

### C. *Usury*

■ Since Mr. Schlick is not in the business of lending money, he is subject only

10. Although the trial court refrained from declaring whether the loans in the instant case were commercial or personal, the evidence showed that the loan proceeds were used only for a commercial purpose. It is undisputed that Mr. Rivera and his associates, needing funds to finish renovating their investment property, secured Mr. Schlick's financial backing and agreed to repay him upon the sale of that property.

11. Both at trial and on appeal, Mr. Rivera has focused on whether the loan itself was commercial or personal. The trial court correctly ruled that this issue need not be reached because D.C.Code § 28–3301 was controlling. But even if the trial court had looked beyond the § 28–3301 question to consider whether the loans involved here were commercial, it would surely have found them to be commercial loans which—although secured by a deed of trust on residential property—were exempt from regulation because the original principal exceeded $5,000 and because the loans were made "for the purpose of acquiring or carrying on a business, professional, or commercial activity." *Needle v. Hoyte,* 644 A.2d 1369, 1371–1372 (D.C.1994).

to the broader scope of the District's usury statute, which applies to any instrument in writing for the payment of money at a future time. If D.C.Code § 28–3301 is applicable, the evidence at trial did not clearly establish that the rate of interest charged by Mr. Schlick exceeded the 24% statutory limit.

Mr. Rivera asserts that the total interest charged on the first promissory note was 38%. We disagree. By Mr. Rivera's account, since the first promissory note required a $20,500 repayment on a $15,000 loan, the repayment sum of $20,500 necessarily included interest. Indeed, Mr. Schlick conceded at trial that a lump sum of approximately $5,000 in interest was included in the first note's repayment sum and that an additional 12% interest could potentially accrue if certain repayment terms were not met.[12] The mere fact, however, that the repayment sum due on the note is greater than the principal amount because of "built-in" interest does not, by itself, show that the rate was usurious.

Mr. Rivera's contentions miss the analytical mark set by the usury statute. As a fundamental matter, Mr. Rivera does not provide an evidentiary basis for calculating this alleged "built-in" rate but simply asserts in his brief, as he did at trial, that the total interest charged on the first promissory note "was in excess of 38%." But there was no evidence of either the repayment date or the terms of any repayment schedule under the first note—information that any trier of fact would need to determine the actual rate. Without this critical information, any effort to determine the applicable interest rate on the first note would be entirely speculative. To be sure, the third note stated that payment was due on September 27, 1999, or "upon sale, transfer, or foreclosure of the house, whichever occurs first; or upon demand of the Noteholder at any time thereafter." However, as the third note itself cautioned, "each note is a separate instrument and obligation," and thus neither the trial court nor this court can extrapolate the terms of the first note from the terms of the third note. In this appeal Mr. Rivera has the burden of demonstrating that the trial court erred in denying his motion for judgment notwithstanding the verdict. *See Oxendine,* 506 A.2d at 1103. Since the only note that could conceivably have exceeded the 24% statutory cap on interest was the first note, the terms of which are not to be found in the record, we hold that Mr. Rivera has not carried his burden of demonstrating error. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C. 1982) ("it is appellant's duty to present this court with a record sufficient to show affirmatively that error occurred" (citations omitted)).

Furthermore, as Mr. Schlick points out, the calculation of interest on a demand note like this one varies according to the time when payment is demanded by the noteholder. Thus, if demand were made one month from the date of the note's execution, the "built-in" interest rate would be quite different from the rate that would be payable if demand were made five years later. Accordingly, if Mr. Schlick continued to lend money until the total sum due and owing reached $55,000, any alleged "built-in" rate had to shrink

---

**12.** While the second and third notes explicitly stated that a 12% interest rate, compounded annually, would apply "in the event the Noteholder makes demand for payment and Borrower fails to pay in full following demand," the record does not disclose the precise terms of the first note, its anticipated repayment schedule, or the conditions that would trigger the additional 12% rate. The first note, as we have mentioned, is not in the record, and the briefs do not make these facts clear.

inversely. Without a definite repayment date against which to measure the $5,500 "built-in" interest, a trier of fact could not find that the loan was usurious. Thus, absent additional information permitting the interest rate to be definitively calculated, and viewing the evidence in the light most favorable to Mr. Schlick, the party who secured the verdict, we hold that the trial court committed no error in denying Mr. Rivera's motion for judgment n.o.v.

The judgment is therefore

*Affirmed.*