Gary TURPIN, et al., Plaintiffs,

v.

MERRELL DOW PHARMACEUTICALS INC., Defendant.

Civ. A. No. 84–105.

United States District Court,
E.D. Kentucky,
London Division.

April 25, 1990.

Barry J. Nace and Thomas H. Tate, Paulson, Nace, Norwind & Sellinger, Washington, D.C., for plaintiffs.

Frank C. Woodside, III, Joseph E. Conley, Jr. and Stephen M. Rosenberger, Dinsmore & Shohl, Cincinnati, Ohio, for defendant.

MEMORANDUM

SILER, Chief Judge.

This action is before the Court on the motion of the defendant Merrell Dow Pharmaceuticals Inc. (Merrell Dow) for summary judgment pursuant to Fed.R.Civ.P. 56. After reviewing the voluminous materials submitted by the parties, including affidavits of experts, trial and deposition transcripts, excerpts of transcripts, summaries of published scientific studies, and numerous decisions of other courts regarding the same or similar issues, the Court is convinced that no genuine issues of material

fact exist and the case can therefore be decided as a matter of law. Thus, for the reasons stated below, Merrell Dow's motion for summary judgment will be granted.

It appears from the record that the parties do not dispute the facts out of which this action arose. Brandy Turpin, minor-plaintiff, was born on February 27, 1982, to plaintiff-parents, Gary and Betty Turpin. Brandy was born with various deformities to both hands and feet which have required several surgical procedures to partially correct. Betty Turpin ingested the drug Bendectin during her pregnancy with Brandy. Bendectin was a prescription pharmaceutical product manufactured by Merrell Dow, and prescribed for the treatment of nausea and vomiting during pregnancy. Bendectin was the only anti-nauseant approved by the Food and Drug Administration (FDA) to combat "morning sickness" experienced by mothers during pregnancy. Merrell Dow removed the product from the marketplace in 1983 due to the increased costs of litigation surrounding the drug.

The plaintiffs assert that Betty Turpin's Bendectin ingestion caused her daughter's birth defects. Merrell Dow argues that the plaintiffs can submit no evidence that supports the contention that a causal association between Bendectin and birth defects exists. Thus, the primary issue to be decided by the Court is whether the plaintiffs have submitted sufficient evidence that Bendectin is teratogenic (capable of causing birth defects) to survive a grant of summary judgment.

## I.

Rule 56(c) of the Federal Rules of Civil Procedure provides that after an adequate opportunity for discovery, see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 2511 n. 5, 91 L.Ed.2d 202 n. 5 (1986), the moving party shall be granted summary judgment when it appears that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "[A] party seeking summary

judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the [record]' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2552. However, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials, *negating* the opponent's claim." *Id.* (Emphasis in original.)

Once a properly supported motion for summary judgment is made, "the nonmovant must go beyond the pleadings and by affidavits or by 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Potters Medical Center v. City Hospital Ass'n*, 800 F.2d 568, 572 (6th Cir.1986), *quoting* Fed.R.Civ.P. Rule 56(c), (e). *See also Anderson, supra,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11.

The standard for granting summary judgment is identical to the standard for a directed verdict under Fed.R.Civ.P. 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.... If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson, supra,* at 250–51, 106 S.Ct. at 2511–12. "The evidence must be viewed in a light most favorable to the party opposing summary judgment and that party must be given the benefit of all reasonable inferences." *Potters, supra,* at 572. *See also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir.1983).

## II.

Merrell Dow contends that human epidemiology studies demonstrate that there is an absence of any evidence connecting Bendectin with birth defects. To support its position, Merrell Dow submitted the sum-

mary of over thirty (30) separate human epidemiology studies, none of which demonstrated any connection between birth defects and Bendectin ingestion. The plaintiffs have submitted contrary testimony. The defendant urges the Court to conclude that this expert testimony, tendered by the plaintiffs, is inadmissible under Fed.R.Evid. 703, as their opinions are not based on facts or data "of a type reasonably relied upon by experts in the particular field." Fed.R.Evid. 703. Merrell Dow argues that as the plaintiffs have offered no confirmed, statistically significant, epidemiological data establishing a causal relationship between Bendectin use and birth defects, summary judgment is appropriate.

The plaintiffs attempt to prove Bendectin's teratogenicity through the presentation of expert opinion testimony of seven scientists representing a variety of fields relating to birth defects including pathology, epidemiology, chemistry, developmental biology, pharmacology, toxicology, embryology, teratology, and dysmorphology. These experts include Drs. Johannes Thiersch, Shanna Swan, Stewart Newman, Frederick Crescitelli, Andrian Gross, Jay Glasser, and John Palmer. While testifying to Bendectin's teratogenicity, these experts draw their opinions from four areas of evidence; studies of analogous chemical structures, *in vivo* and *in vitro* animal studies, and from the criticism and reanalysis of various of the epidemiological studies submitted by the defendants.

A review of the record reveals the content of each expert's trial testimony. Dr. Johannes Thiersch, a specialist in pathology and pharmacology, would testify that a chemical's composition and its physiological activity is a decisive factor in teratogenic investigations. Dr. Shanna Swan, an epidemiologist and biostatistician, would testify considering all available data, and using the methodology reasonably relied upon by epidemiologists, that with a reasonable degree of medical certainty Bendectin is associated with limb reduction defects. Dr. Stewart Newman, a specialist in developmental, cell, and molecular biology, would testify based on *in vitro* studies and the pharmacological aspects of Bendectin, that

Bendectin is a human teratogen capable of causing birth defects in the developing limbs of human beings. Dr. Adrian Gross, a veterinarian with experience in pathology and toxicology, would testify based on animal studies that Bendectin is teratogenic. Dr. Jay Glasser, a professor of biometry and computer science, with other teaching experience in epidemiology, statistics and biostatistics, would testify based on data reasonably relied upon by biometrists, epidemiologists, and biostatisticians, that Bendectin was epidemiologically statistically associated with limb defects. Dr. Frederick Crescitelli, a biologist with accessory training in physics and chemistry, would testify based on analysis of Bendectin's antihistaminic component, that Bendectin is a teratogen. Dr. John Palmer, a physician and pharmacology professor, would testify based on pharmacological data, animal studies, *in vitro* studies, epidemiological data and other human data, that Bendectin, specifically its antihistaminic component, has teratogenic properties. Dr. Palmer also examined the medical records pertaining to Brandy Turpin and would testify that within a reasonable degree of medical certainty Bendectin was taken during a period of time that would affect the cells that produce normal limbs in Brandy Turpin and that Bendectin did in fact cause the limb defects from which she suffers. The plaintiffs also submitted materials regarding the credentials and testimony of Dr. Alan Done, Dr. Wayne Snodgrass, and Dr. W.G. McBride, but did not indicate that their testimony would be offered at trial. *See Daubert v. Merrell Dow*, 727 F.Supp. 570, 574–75 (S.D.Cal.1989) (outlining more fully the proffered testimony of each expert above, with the exception of Dr. Crescitelli).

### III.

Fed.R.Evid. 703 requires that the grounds relied upon in the formulation of an expert opinion be of "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. "Whether an expert's opinion has an adequate basis,

and whether without it an evidentiary burden has been met, are matters of law for the court to decide." *Richardson v. Richardson–Merrell*, 857 F.2d 823, 829 (D.C. Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989); *see United States v. Kozminski*, 821 F.2d 1186, 1194 (6th Cir.1987), *aff'd*, 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1989). In *Kozminski*, the Sixth Circuit developed a four-part test that must be satisfied for expert testimony to be admissible. To be admissible the testimony must: (1) be by a qualified expert; (2) be on a proper subject; (3) be in conformity to a generally accepted explanatory theory; (4) and have a probative value which outweighs any prejudicial effect. *Kozminski, supra*, at 1194. *See also Novak v. United States*, 865 F.2d 718, 721 (6th Cir.1989) (applying test in a civil action); *Sterling v. Velsicol Chemical*, 855 F.2d 1188, 1208–09 (6th Cir.1988) (applying *Kozminski* test). The plaintiffs' experts' testimony, while satisfying three prongs of the test, fails the third prong in that their testimony is not in conformity with a generally accepted explanatory theory in light of the overwhelming epidemiological data governing the non-teratogenicity of Bendectin.

As the Sixth Circuit has made no pronouncement that epidemiological studies form the sole basis upon which experts may reasonably rely when forming an opinion on a drug's teratogenicity, the Court must look to other circuits for guidance. *See In re Richardson Merrell, Inc. Bendectin Products Liability Litigation*, 624 F.Supp. 1212 (S.D.Ohio 1985), *aff'd*, 857 F.2d 290 (6th Cir.1988), *cert. denied, Hoffman v. Merrell Dow*, —— U.S. ——, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989) (Although Judge Rubin allowed the presentation of "testimony of eminently qualified and highly credible experts" on both sides, no ruling was made regarding the third prong of the *Kozminski* test. In fact, defense counsel admits no objection to the admissibility of the plaintiffs' experts was raised, nor was there a motion for directed verdict based upon the insufficiency of evidence in that action.).

Three circuits have rejected similar proof submitted by the plaintiffs in this action, holding that the evidence was insufficient to support a finding of Bendectin's causal connection with birth defects. In *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823 (D.C.Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989), the D.C. Circuit affirmed the trial judge's holding that the evidence presented at trial was insufficient to support the jury's determination that Bendectin caused the minor-plaintiff's limb reduction defects. In ruling that the plaintiff's relevant evidence of causation was inadmissible under Fed.R.Evid. 703, the court looked behind the expert's ultimate conclusion that Bendectin causes birth defects and analyzed the adequacy of its foundation. *Id.* at 829. The court examined the probative value of the four types of data relied upon by the plaintiff's expert, Dr. Alan Done, and concluded:

These three types of studies then—chemical, *in vitro*, and *in vivo*—cannot furnish a sufficient foundation for a conclusion that Bendectin caused the birth defects at issue in this case. Studies of this kind, singly or in combination, are not capable of proving causation in human beings in the face of the overwhelming body of contradictory epidemiological evidence. Perhaps mindful of this, the last type of evidence considered by Dr. Done consisted of epidemiological studies. When such studies are available and relevant, and particularly when they are numerous and span a significant period of time, they assume a very important role in determinations of questions of causation.

*Id.* at 830. Rejecting Dr. Done's epidemiological data, the court wrote:

Dr. Done further admitted that no one who has published work on Bendectin has concluded that there is a statistically significant association between Bendectin and limb reduction defects of the type at issue in this case. Only by recalculating the data was Dr. Done able to obtain what he deems a statistically significant result. Moreover, the studies rejected by Dr. Done had been published in peer-reviewed scientific journals, while Dr. Done

has neither published his recalculations nor offered them for peer review. (Footnotes omitted.)

*Id.* at 831. The court further distinguished its case from *Ferebee v. Chevron Chemical,* 736 F.2d 1529 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), where the defendant's argument that the testimony of plaintiff's experts was inadmissible was rejected. The court stated that in *Ferebee* the causation issue was novel and "stand[s] at the frontier of current medical and epidemiological inquiry," whereas the wealth of published epidemiological data involving Bendectin was a great distance from the "frontier." *Id.* at 832. *See also Ealy v. Richardson–Merrell,* 897 F.2d 1159 (D.C.Cir.1990) (The court followed *Richardson* and reversed a finding for the plaintiffs on the issue of liability holding that none of the evidence relied upon by the Ealys' experts, either singly or in combination, provided an adequate scientific foundation to render their opinions on human causation admissible. Several of the plaintiffs' experts in this action were the same as in the *Ealy* trial, including Drs. Gross, Newman, Swan, and Thiersch. In fact, the plaintiffs support their position in this action with several transcript excerpts and affidavits from the *Ealy* case.). *See also* Elliott, *Toward Incentive–Based Procedure: Three Approaches for Regulating Scientific Evidence,* 69 Boston Univ.L.R. 487, 498–99 (1989) (approving the *Richardson* rule).

The Fifth Circuit reversed a lower court's entry of a judgment on a jury verdict in favor of the plaintiffs, holding that the lack of conclusive epidemiological proof was fatal to the plaintiffs' case. *Brock v. Merrell Dow,* 874 F.2d 307 *mod.* 884 F.2d 166 (5th Cir.1989), cert. den., —— U.S. ——, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990). The court rejected the plaintiffs' *in vivo* and *in vitro* studies, chemical analysis evidence, and reanalysis of existing epidemiological data, offered by Drs. Glasser, Newman, Thiersch (all present in this action), Snodgrass, Glauser and McBride. The court held:

> We find, in this case, the Brocks' failure to present statistically significant epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case. While we do not hold that epidemiologic proof is a necessary element in all toxic tort cases, it is certainly a very important element. This is especially true when the other evidence is in the form of animal studies of questionable applicability to humans.

*Id.* at 313, *mod.* 884 F.2d at 167. The court encouraged district judges "faced with medical and epidemiologic proof in subsequent toxic tort cases to be especially vigilant in scrutinizing the basis, reasoning, and statistical significance of studies presented by both sides." *Id.* at 167.

In *Lynch v. Merrell–National Laboratories,* 646 F.Supp. 856, 867–68 (D.Mass. 1986), *aff'd,* 830 F.2d 1190 (1st Cir.1987), the district court granted summary judgment for the defendants. The plaintiffs' evidence, including reanalysis criticizing the methodology of other epidemiological studies, extrapolations from *in vivo* and *in vitro* animal studies, and studies of analogous chemical structures, was ruled inadmissible by the court, under Fed.R.Evid. 703:

> [A] careful review of the material before this Court indicates that the only relevant, probative, and non-misleading evidence on the issue of Bendectin's role in the causation of birth defects are the controlled observations of human beings, documented in more than 25 published epidemiological studies. The data from these studies do not indicate any statistically significant association between Bendectin and ... birth defect[s].... This Court finds that the evidence submitted by the plaintiffs in support of their expert testimony does not comport with the requirements of the Federal Rules of Evidence. Absent admissible and competent expert testimony grounded on evidence comporting with the requirements of the Federal Rules of Evidence, the plaintiffs cannot raise a genuine issue of material fact concerning Bendectin ... [and] the causation of ... birth defect[s].

*Lynch, supra,* at 867. The First Circuit affirmed the lower court's decision after carefully analyzing the proffered testimony

of Drs. Swan and Done. *Lynch, supra,* at 1194–96.

In addition to *Richardson, Brock* and *Lynch,* other courts have ruled as a matter of law that the evidence supporting Bendectin's teratogenicity was insufficient. *See Daubert v. Merrell Dow,* 727 F.Supp. 570 (S.D.Cal.1989) (The court granted defendant's motion for summary judgment where evidence from Drs. Gross, Newman, Swan, Glasser, Thiersch and Palmer, was identical to their proffered testimony in this action. Following *Brock, Richardson* and *Lynch,* the court held epidemiological studies to be the most reliable evidence of causation and rejected the proffered chemical, *in vitro* and *in vivo* studies, and reanalysis of epidemiological studies.); *Hull v. Merrell Dow,* 700 F.Supp. 28 (S.D.Fla.1988) (Summary judgment was granted as no genuine issue of fact as to causation existed. The motion was unopposed as the plaintiffs were unrepresented by counsel at the motion's filing.); *DeLucca v. Merrell Dow,* Civ. No. 87–226 (D.N.J. June 12, 1989) (Court granted summary judgment after similar evidence was excluded under Fed.R. Evid. 703.); *Monahan v. Merrell Dow,* No. 83–3108–WD (D.Mass. December 18, 1987) (Relying on *Lynch,* the court granted defendant's motion for summary judgment.); *DePyper v. Navaro,* No. 83–303–467NM (Civ.Ct. Wayne Co., Mich. March 10, 1990) (State court excluded similar evidence, including testimony of Drs. Swan and Glasser in granting defendant's motion for summary judgment.). *See also Wilson v. Merrell Dow,* 893 F.2d 1149, 1155 (10th Cir.1990) (The lower court's judgment on a jury verdict affirmed for defendant, concluding that the defendant's evidence was "perhaps enough to sustain a directed verdict under *Brock, Richardson* and *Lynch.*"); *In re Paoli R.R. Yard PCB Litigation,* 706 F.Supp. 358, 369 (E.D.Pa. 1988) (Although this involved PCB exposure and not Bendectin, the court relied heavily on epidemiological data showing no connection between PCB exposure and the plaintiffs' injuries. The court excluded animal study evidence under Fed.R.Evid. 703 and granted summary judgment for defendants. *Ramirez v. Richardson Merrell,*

85–1504 (E.D.Pa. September 4, 1986); and *Lanzilotti v. Merrell Dow,* 82–0183, 1986 WL 7832 (E.D.Pa. July 10, 1986), Bendectin cases in which summary judgment was denied, were cited by the court, although it relied on *Richardson* and *In re "Agent Orange",* 611 F.Supp. 1221 (E.D.N.Y.1985), *aff'd on other grounds,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988), in evaluating the proffered evidence.).

## IV.

■ The plaintiffs argue that Merrell Dow's proffered recitation of authority is not applicable to this case. However, the affidavits and testimony of the experts in this action were submitted from other cases. Identical testimony was rejected in *Lynch* (Dr. Swan), *Brock* (Drs. Newman, Glasser and Thiersch), *Ealy* (Drs. Gross, Newman, Swan, Thiersch), *DePyper* (Drs. Swan and Glasser), and *Daubert* (Drs. Thiersch, Swan, Newman, Gross, Glasser, Palmer). The *in vivo, in vitro,* chemical and epidemiological data relied on here has been ruled inadequate as a matter of law to support a finding that Bendectin is teratogenic. *See Richardson, supra, Brock, supra, Lynch, supra.*

While the court was not cited a case referring the testimony of Dr. Frederick Crescitelli, his proffered testimony based on chemical studies, *in vivo* and *in vitro* animal studies, adds nothing new and falls far short of "new and statistically significant studies ... which would give a jury a firmer basis on which to determine the issue of causation." *Brock, supra,* at 167.

All the plaintiffs' experts would testify, in some form or fashion, that the data they relied on to formulate their opinion that Bendectin is teratogenic is of the type that is generally and reasonably relied upon in their particular fields. The Court will not rehash the rationale for rejecting this assertion with regard to the animal studies and chemical studies, as numerous opinions have accurately concluded that they are inadequate and insufficient to support, by a preponderance of the evidence, the conclusion that a causal relationship exists be-

tween birth defects and Bendectin. *See Brock, supra; Richardson, supra; Lynch, supra.*

However, to explain why the defendant's epidemiological data are admissible, where the epidemiological data of the plaintiffs' are not, there are distinct differences between the thirty (30) epidemiological studies, all finding no statistically significant relationship between Bendectin and birth defects, submitted by Merrell Dow and the proffered testimony of Drs. Swan and Glasser. Dr. Swan merely reanalyzes and recalculates existing epidemiological data to support a conclusion of a statistically significant increased risk between exposure to Bendectin and birth defects. Dr. Glasser is not an epidemiologist, medical doctor, or teratologist. He has published no articles on Bendectin, performed no epidemiological studies on Bendectin, and has admitted that no epidemiological study has revealed a statistically significant association between Bendectin and limb reduction defects, yet he concludes that it is more likely than not that a statistically significant association exists. The conclusions of Drs. Swan and Glasser have never been referred or published in peer-reviewed scientific journals. *See Lynch, supra,* at 1195; *Brock, supra,* at 312. *See also Richardson, supra,* at 831 (similar data furnished by Dr. Done rejected). Therefore, the Court, following *Brock*'s mandate to scrutinize the basis, reasoning, and statistical significance of epidemiologic studies, finds the testimony of Drs. Swan and Glasser inadmissible under Fed.R.Evid. 703.

The plaintiffs rely on several cases which give more deference to expert testimony than *Brock, Lynch,* and *Richardson.* However, the Court is persuaded that the prevailing school of thought governing expert testimony in Bendectin cases is best exemplified by *Brock. See Daubert, supra,* at 572. *Oxendine v. Merrell–Dow,* 506 A.2d 1100 (D.C.1986) (Oxendine I); *but cf., Oxendine v. Merrell–Dow,* 563 A.2d 330 (D.C.1989) (Oxendine II) (These cases allowed the introduction of expert opinion including Dr. Done's testimony. However,

the *Richardson* opinion specifically rejected *Oxendine's* reasoning and noted the differences between state and federal rules of evidence regarding admissibility. *Richardson, supra,* at 825 n. 9.); *Ealy v. Richardson Merrell,* C.A. 83–3504 (D.D.C.1987) (Jury returned a verdict for $20 million in compensatory damages and $75 million in punitive damages for plaintiff. However, this decision was reversed by *Ealy v. Richardson–Merrell,* 897 F.2d 1159 (D.C.Cir. 1990)); *In re Bendectin Litigation, supra* (The issue of admissibility of expert testimony was not squarely before the court.). Although the plaintiffs cite other authority, the Court finds them to be in the minority, and only the state case of *Oxendine* has been subjected to appellate review and survived.

The plaintiffs assert that these cases provide the basis for denying the defendant's summary judgment motion as they refute the contention that no reasonable jury could find in favor of the plaintiffs. However, the evidence considered by those juries varies sharply from the relevant admissible evidence that survives this Court's ruling that the plaintiffs' *in vivo, in vitro* animal studies, chemical studies, and human data are inadmissible under Fed.R. Evid. 703. While reasonable jurors can, and did, find for the plaintiffs in other opinions, *see Oxendine, supra,* no reasonable jury could find that a causal connection exists between Bendectin and birth defects in this action.

The plaintiffs cite *In re Bendectin,* 732 F.Supp. 744 (E.D.Mich.1990); *Wilson v. Merrell Dow,* Case No. 82–C–710–E (N.D. Okla. March 1, 1990); *Comeau v. Richardson–Merrell,* C.A. No. 84–0963N (D.Mass. March 1, 1990); and *Barton v. Richardson–Merrell,* Case No. C85–0028J (D.Utah March 2, 1990), as support that summary judgment is inappropriate. However, the tendered orders do not mention the evidence the courts considered in reaching their decision. The bare fact that summary judgment was denied without viewing the record, would force this Court to guess the bases for those courts' decision. Therefore, this authority is not persuasive.

## CONCLUSION

If Rule 703 is to be of any limit on the ability of expert witnesses to give their opinions, a court must be permitted to examine the bases of the proffered opinions. Otherwise any case in which an expert was willing to use two sets of magic words would always survive motions for summary judgment and directed verdict. As long as the expert was willing to say "to a reasonable degree of scientific certainty" and "the basis of my opinion is X, on which experts in my field reasonably rely," every case requiring expert testimony would get to the jury. If a court is not permitted to examine the basis of an expert's opinion in order to rule on the admissibility of that opinion, then Rule 703 should read: "An expert may cite as the basis of his opinion anything he likes."

*In re Paoli R.R. Yard PCB Litigation,* *supra,* at 368. *See also Brock, supra,* at 167.

In light of over thirty (30) epidemiological studies concluding that no statistically significant association exists between Bendectin and human birth defects, and after closely scrutinizing the bases of the proffered opinions of the plaintiffs' experts, this Court concludes that the testimony is inadmissible under Fed.R.Evid. 703. Furthermore, even if admissible, these opinions only support the conclusion that it is possible that Bendectin is teratogenic, and not more likely or probable than not that a causal relationship exists between Bendectin and human birth defects. Even viewing the record in the light most favorable to the nonmoving party, the plaintiffs have failed to meet their burden. Thus, summary judgment is appropriate.

The Court is not ruling that only epidemiological data is admissible when examining the question of a drug's teratogenicity. Experts may rely on other types of data when framing their opinions. However, something more than the animal studies, analogous chemical studies, and criticisms of the epidemiological data, presented in this action, must be submitted. Until that occurs, or until new and conclusive medical and epidemiological studies emerge which give a jury a firmer basis on which to determine the issue of causation, *see* *Brock, supra,* at 315, courts must rely on the current data that no statistically significant association between Bendectin and human birth defects exists.

Accordingly, Merrell Dow's motion for summary judgment will be granted.