951 F.2d 348
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Lona G. BOYD, Plaintiff-Appellee,
v.
The CELOTEX CORPORATION; Pittsburgh Corning Corporation;
Fibreboard Corporation; and Owens-Illinois, Inc.,
Defendants-Appellants.
 Nos. 91-5009, 91-5319.
 United States Court of Appeals, Sixth Circuit.
 Dec. 30, 1991.
 
 Before RYAN and BOGGS, Circuit Judges, and HOOD, District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Owens-Illinois, Inc. appeals the jury verdict for Lona Boyd in this diversity products liability action arising from plaintiff's husband's death of peritoneal mesothelioma allegedly caused by exposure to asbestos. We conclude that none of the errors assigned by defendant merits reversal or new trial, and we shall therefore affirm.
 
 I.
 
 2
 Decedent Milton Boyd worked as an insulation applicator for over 40 years. During that time, he was exposed to over 60 different products containing asbestos from 14 different manufacturers. He was exposed to Owens-Illinois' "Kaylo" insulation at various times between 1948 and 1958. Kaylo was a thermal insulation product containing 13% to 25% chrysotile and/or amosite asbestos and was manufactured by Owens-Illinois until April 30, 1958. There was no evidence that Owens-Illinois ever placed warning labels on its product.
 
 
 3
 In 1977, Boyd was diagnosed as suffering from asbestosis. He continued to work, however, until his voluntary retirement in May 1987. Boyd was apparently in fair physical condition following his retirement, but in March 1988 he became severely ill. Exploratory surgery on April 1, 1988 revealed a malignant cancerous tumor in the lower right part of his stomach. Specifically, the diagnosis was of mesothelioma. Boyd underwent chemotherapy after his surgery. Lona Boyd testified to the extreme pain suffered by her husband following the onset of mesothelioma.
 
 
 4
 Mr. and Mrs. Boyd brought a state court proceeding against 23 defendants in 1977 which resulted in settlements with all but four asbestos manufacturers, and a voluntary nonsuit on May 19, 1988. On May 23, 1988, the Boyds filed their complaint in the United States District Court for the Middle District of Tennessee against Owens-Illinois, Celotex, Fibreboard, and Pittsburgh Corning, alleging that Milton Boyd's exposure to asbestos had caused his mesothelioma. Lona Boyd sued for loss of consortium.
 
 
 5
 Milton Boyd died on July 13, 1988 at the age of 65. Lona Boyd was substituted as plaintiff on November 18, 1988. Defendants Fibreboard and Pittsburgh Corning were dismissed prior to trial. The jury found for Lona Boyd and awarded her $450,000 on her wrongful death claim, and $150,000 for loss of consortium. A judgment for $600,000 was entered by the district court, but later amended to $213,624.66 for wrongful death and $71,208.22 for loss of consortium to reflect credits against the judgment for amounts received in settlement.
 
 II.
 
 6
 In reviewing motions for judgment notwithstanding the verdict, we use the same test as the district court. Frost v. Hawkins County Bd. of Educ., 851 F.2d 822, 826 (6th Cir.), cert. denied, 488 U.S. 981 (1988). The standard of review is "whether there was sufficient evidence to raise a material question of fact for the jury." Id. We may not weigh the evidence nor pass on the credibility of the witnesses. Morelock v. NCR Corp., 586 F.2d 1096, 1104-05 (6th Cir.1978), cert. denied, 441 U.S. 906 (1979). After viewing the evidence in the light most favorable to the party against whom the motion is made and drawing all inferences in her favor, we should grant the motion only if the evidence "points so strongly in favor of the movant that reasonable minds could not come to a different conclusion." Id.
 
 A.
 
 7
 Defendant assigns error to the trial court's refusal to grant judgment in its favor as a matter of law, arguing that there existed uncontradicted evidence that it complied at all relevant times (1948-1958) with applicable laws and that recognized scientific and industry standards at that time suggested that exposure to 5 million particles per cubic foot (mppcf) of asbestos dust was a safe level for humans. It asserts that compliance with the scientific and medical standards known at the time provides it with a complete "state of the art" defense under Tennessee law. Tennessee statutory law provides:
 
 
 8
 Determination of defective or dangerous condition.--(a) A manufacturer or seller of a product shall not be liable for any injury to person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.
 
 
 9
 (b) In making this determination the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.
 
 
 10
 Tenn.Code Ann. § 29-28-105.
 
 
 11
 Milton Boyd testified by pretrial deposition to having breathed asbestos dust while using Kaylo. Expert testimony suggested that dust at the level of 5mppcf would be invisible and become visible only at concentrations of 100mppcf. Thus, there was evidence that Boyd was exposed to levels far in excess of the levels thought safe even at that time. Moreover, it appears that the testimony relied on by Owens-Illinois to establish its compliance with the 5mppcf level related only to conditions at their New Jersey factory where Kaylo was manufactured, not to the exposure conditions faced by Boyd in his job as an applicator. While Owens-Illinois argues that applicators such as Boyd would be exposed to little dust through their work, and that Kaylo was a product which was given to raising little dust compared to other asbestos products, these contentions only raise a jury question in light of the contrary evidence presented by plaintiff.
 
 
 12
 Defendant also introduced evidence of reports published in the 1940s and 1950s questioning the 5mppcf threshold limit value as a safe level. The state of the art defense in Tennessee involves knowledge available to a manufacturer or seller at the time the product was placed on the market. Tenn.Code Ann. § 29-28-105. The evidence of industry standards did not entitle defendant to a judgment as a matter of law, though it was entitled to and did receive a jury instruction setting forth its state of the art defense. See Clarksville-Montgomery County School Sys. v. United States Gypsum Co., 925 F.2d 993, 1005-06 (6th Cir.1991). Not only was evidence of noncompliance with the standard produced, but the jury was entitled to reject evidence of industry customs or the 5mppcf standard as establishing due care. See George v. Celotex Corp., 914 F.2d 26, 28-29 (2d Cir.1990). The jury was also properly instructed as to the rebuttable presumption against finding a product to be unreasonably dangerous or defective if the manufacturer or seller complied with governmental laws and regulations concerning its manufacture and use.
 
 
 13
 Defendant's second argument relating to its state of the art defense involves evidence that mesothelioma was not epidemiologically linked to asbestos exposure until 1960, two years after Owens-Illinois ceased the production and sale of Kaylo. This evidence, it argues, entitled it to a judgment as a matter of law, for there is no possible way it could have foreseen, or warned of, a link between asbestos and peritoneal mesothelioma prior to that time. Owens-Illinois cites Jones v. Miles Laboratories, Inc., 887 F.2d 1576 (11th Cir.1989), where a district court's judgment n.o.v. in favor of the defendant who was sued when plaintiff contracted AIDS from a blood product was affirmed on the basis that as of early 1983, there was no substantial evidence establishing an industry practice in blood labs to ask "high-risk" questions regarding exposure to the HIV virus.
 
 
 14
 In Jones, however, the only evidence submitted by plaintiff on the issue of negligence was industry custom. Id. at 1578. No substantial evidence was introduced to show that an industry custom to ask "high-risk" questions was in effect at the relevant time. Id. at 1581. The question of what the industry custom should have been was not presented to the jury because there was no evidence introduced concerning the state of knowledge in the industry at the relevant time. Id.
 
 
 15
 In this case, defendant presented, through expert testimony, various reports describing mesothelioma in those exposed to asbestos in their occupations as early as 1943. Moreover, the dangers of exposure to asbestos generally, as they relate to diseases such as lung cancer and asbestosis, were known even earlier. Thus, unlike the defendant in Jones, Owens-Illinois was challenged as to the adequacy of warnings based on the state of knowledge available at the time rather than on industry custom. Defendant presented sufficient evidence to warrant submission of the issue to the jury.
 
 B.
 
 16
 Owens-Illinois claims that the overwhelming weight of evidence supports its argument that exposure to chrysotile asbestos does not cause peritoneal mesothelioma. The jury verdict was therefore based on "bad science" and cannot stand. It also argues that there was insufficient evidence to permit a reasonable juror to conclude that exposure to Kaylo was a "substantial factor" in causing Boyd's illness and death. Defendant claims that Mrs. Boyd failed to meet her burden of presenting evidence related to the "frequency, regularity and proximity" of exposure sufficient to permit a reasonable jury to find causation by exposure to Kaylo, citing Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162-63 (4th Cir.1986).
 
 
 17
 With respect to its first argument, defendant fails once again to demonstrate why the evidence presented on this issue was beyond the purview of the jury. Though defendant's expert witness, Dr. Lee Reichman, discredited the results of the 1988 Mancuso study linking chrysotile asbestos to mesothelioma, this criticism does not conclusively prove the invalidity of the Mancuso study results. In fact, Dr. Reichman admitted the possibility that exposure to chrysotile could cause mesothelioma if it was in an amount sufficient to cause asbestosis. Milton Boyd suffered from both asbestosis and mesothelioma.
 
 
 18
 Moreover, an expert witness for plaintiff, Dr. Yasunosuke Suzuki, testified as to his own studies of mesothelioma in humans and animals, linking the disease to chrysotile asbestos, and to his own conclusion that Milton Boyd died of a malignant mesothelioma contracted by exposure to asbestos. Dr. Steven Markowitz also offered essentially the same opinion, based on his review of Milton Boyd's records. There is enough evidence to support a reasonable conclusion that defendant's product may have caused mesothelioma.
 
 
 19
 In addressing its argument that insufficient evidence supported a finding of causation, Owens-Illinois offers a peculiarly skewed picture of the facts presented to the jury. It states that Milton Boyd testified to exposure to Kaylo on only "three occasions." However, it is clear that plaintiff offered evidence of not just three exposures, but of exposures at six work facilities over a period of several years. Milton Boyd testified that he was exposed to Kaylo pipe covering and block at six jobs: 1) fourteen months at a steam plant in Miamisburg, Ohio in 1948 and 1949; 2) two months at a refinery in Robinson, Illinois in 1949; 3) at a steam plant in New Johnsonville, Tennessee between 1951 and 1953; 4) three months at a power plant in St. Marks, Florida in 1958; 5) two months at a power plant in Gorgas, Alabama in 1958; and 6) again at the steam plant in New Johnsonville, Tennessee for four months in 1958 and 1959.[1] His testimony also recounted cutting and fitting Kaylo, dust in the air on those occasions, and breathing asbestos dust from the product. Defendant's claim that Milton Boyd was exposed to Kaylo on three isolated occasions is inaccurate.
 
 
 20
 With this factual basis established, Lohrmann, 782 F.2d at 1162-63, is seen as inapposite to this case. In Lohrmann, the plaintiff failed to prove any exposure to defendant Raymark's asbestos products, relying merely on invoices that his employer purchased such products; as to another defendant, Pittsburgh Corning, plaintiff testified to being exposed only ten to fifteen times over a 39-year period of working with asbestos; and as to a third defendant, Celotex, there was testimony that its products were present in the shipyard where plaintiff worked, but no testimony established any exposure. Id. at 1163-64. On these facts, a directed verdict in favor of the defendants was affirmed, for it was held that no reasonable juror could have found causation when looking at the frequency, regularity, and proximity of exposure to those products.
 
 
 21
 Milton Boyd's deposition testimony established not only exposure to Kaylo, but repeated exposures over extended periods of time. This evidence was enough to support submission to a jury of the question of causation, even under the "frequency, regularity and proximity" test set forth in Lohrmann.
 
 III.
 
 22
 Defendant offers several arguments against the award of loss of consortium damages. First, it argues that Lona Boyd was unable under Tennessee law to assert her claims for loss of consortium because this case was a wrongful death action and the jury should not therefore have been instructed on loss of consortium.
 
 
 23
 Loss of consortium is a viable cause of action in Tennessee. Tenn.Code Ann. § 25-1-106. Tennessee law also permits a surviving spouse to succeed to the personal injury action of decedent. Tenn.Code Ann. § 20-5-106.
 
 
 24
 Lona Boyd's claim for loss of consortium was filed while Milton Boyd was still alive. After her husband's death, Lona Boyd was substituted as the sole plaintiff, succeeding to his claims under section 20-5-106. She did not, however, discontinue her own claim for loss of consortium based on her husband's illness. "Although a husband's or wife's claim for loss of consortium will always be 'derivative' in the sense that the injuries to his or her spouse are an element and must be proved, the right to recover for loss of consortium is a right independent of the spouse's right to recover for the injuries themselves." Swafford v. City of Chattanooga, 743 S.W.2d 174, 178 (Tenn.App.1987). Mrs. Boyd's separate and independent claim for loss of consortium was not extinguished upon her husband's death.
 
 
 25
 Defendant claims next that the instructions allowing for loss of consortium, even if legally correct, were misleading because they did not specifically limit the jury to considering the loss of consortium for only the four months between the diagnosis of Milton Boyd's peritoneal mesothelioma and his death, rather than the longer period during which he suffered from asbestosis.[2]
 
 
 26
 Jury instructions are reviewed as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision. Kitchen v. Chippewa Valley Schools, 825 F.2d 1004, 1010-11 (6th Cir.1987). A judgment may be reversed if the instructions, viewed as a whole, were confusing, misleading and prejudicial. Beard v. Norwegian Caribbean Lines, 900 F.2d 71, 72-73 (6th Cir.1990).
 
 
 27
 The instructions taken as a whole, while not a model of precision, appear to have sufficiently apprised the jury that loss of consortium was available only for the four-month period from the onset of mesothelioma to death. The instructions stated expressly that loss of consortium damages ended upon Milton Boyd's death and referred throughout only to the claim for peritoneal mesothelioma, not asbestosis.
 
 
 28
 Finally, Owens-Illinois contends that the $150,000 damages award for loss of consortium was excessive and must be overturned. In support of this argument, defendant virtually ignores the record and directs us to numerous cases where trial courts have remitted loss of consortium awards, allegedly to create a reasonable ratio between compensatory awards and loss of consortium.[3]
 
 
 29
 Loss of consortium includes not only loss of support and services, but loss of love, companionship, affection, society, sexual relations, solace and more. Thompson v. National R.R. Passenger Corp., 621 F.2d 814, 826 (6th Cir.), cert. denied, 449 U.S. 1035 (1980); Swafford, 743 S.W.2d at 178. As to the claimed excessiveness of an award, we will not overturn a jury verdict if the verdict is within the range of proof and the jury was properly instructed. American Anodco, Inc. v. Reynolds Metals Co., 743 F.2d 417, 424 (6th Cir.1984). This court has stated that a damage award should not be overturned unless it is so disproportionately large as to "shock the judicial conscience," Thompson, 621 F.2d at 827; unless the court is left with a "definite and firm conviction that a mistake has been committed," Neyer v. United States, 845 F.2d 641, 645 (6th Cir.1988); or unless it is "contrary to all reason." Lewis v. Sears, Roebuck & Co., 845 F.2d 624, 635 (6th Cir.1988). When considering whether an award is excessive, we may consider awards in similar cases. Thompson, 621 F.2d at 827.
 
 
 30
 A determination whether a loss of consortium award is excessive is difficult. We, like the jury, are asked to place a pecuniary value on the loss of the most sensitive, intimate, and abstract qualities of any human relationship: the love, companionship, feelings, and society of spouses. Fixing a quantifiable pecuniary value on a loss of that sort is almost too subjective to admit of reasoned disagreement.
 
 
 31
 We are not advised of any improper evidence or argument that may have induced the jury to make a loss of consortium award based upon passion or improper influence. While there is no direct evidence in the record of loss of services or other aspects of consortium, that is not uncommon since the nature of the subject usually does not lend itself to a description of specific, quantifiable losses. Necessarily, the evidence of Mrs. Boyd's loss of consortium was circumstantial, and was derived primarily from the inferences the jurors could properly draw as to the effect upon Mrs. Boyd of her husband's painful and consuming illness.
 
 
 32
 We are not prepared to say that the jurors' consortium award is "contrary to all reason" or "shock[s] the judicial conscience." Neither are we prepared to say that we know better than the trial jurors how to quantify, in dollars, Mrs. Boyd's loss.
 
 
 33
 We have carefully considered defendant's other assignments of error and find them to be without merit.
 
 IV.
 
 34
 The judgment entered below is AFFIRMED.
 
 
 35
 BOGGS, Circuit Judge, concurring in part and dissenting in part.
 
 
 36
 While I generally agree with the opinion in this case upholding defendant's liability, I write separately to emphasize one point with regard to the scientific evidence in this case. It is undisputed that the type of asbestos that has led to the vast majority of the deaths and injuries associated with "asbestos" and the vast majority of litigation is a type known as amphibole. There is a growing body of scientific evidence, see, e.g. Richard Stone, No Meeting of the Minds On Asbestos, 254 Science Mag. 928-31 (1991), indicating that the type of asbestos known as "chrysotile," the type found in defendant's product, is not, in fact, dangerous in anything like the quantities involved here. The court's review of the evidence at pages 7-8 of the opinion, I agree, demonstrates why there was enough evidence to go to the jury in this case. However, I do not agree that a defendant is required to "conclusively prove the invalidity" of a study presented by an alleged expert before scientific evidence may reach the point that a plaintiff's theory does not have sufficient validity to support a verdict. As several courts have held in cases involving the drug Bendectin, the general state of scientific learning may reach a point that a plaintiff's verdict in insupportable, even though there may still remain a witness to the contrary. Ealy v. Richardson-Merrell, Inc., 897 F.2d 1159, 1160 (D.C.Cir.), cert. denied, 111 S.Ct. 370 (1990); Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307, 309-11, modified, 884 F.2d 166 (5th Cir.1989), cert. denied, 110 S.Ct. 1511 (1990); Richardson by Richardson v. Richardson-Merrell, Inc., 857 F.2d 823, 829-32 (D.C.Cir.1988), cert. denied, 493 U.S. 882 (1989); Lynch v. Merrell-National Lab., 830 F.2d 1190, 1194-96 (1st Cir.1987); Turpin v. Merrell Dow Pharmaceuticals, Inc., 736 F.Supp. 737, 739-42 (E.D.Ky.1990).
 
 
 37
 I dissent with regard to the loss of consortium award. The claim for loss of consortium is related to time, and is time-limited. As the court correctly notes at pace 11, "loss of consortium was available only for the four-month period from the onset of mesothelioma to death." Thus, in this case, the jury awarded loss of consortium damages at a rate of $450,000 per year. This is ten times the award in any other Tennessee case. While the circumstances in this case are certainly heart-wrenching, there is no indication that they are significantly more aggravated than in other cases involving the death of a loved one. I thus cannot agree that "the verdict [was] within the range of proof...." American Anodco, Inc. v. Reynolds Metals Co., 744 F.2d 417, 424 (6th Cir.1984). Unless we are to abandon our assigned role of insuring that the law, even the law of damages, is adhered to, we cannot say, as the court seems to say at page 13, that with regard to loss of consortium, we cannot make a reasoned judgment as to the lawfulness of a jury verdict. I do not agree that "fixing a quantifiable pecuniary value on a loss of that sort is almost too subjective to admit of reasoned disagreement," and I therefore respectfully dissent.
 
 
 
 *
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 When questioned on this point at oral argument, defendant pointed to some doubt in the testimony of Milton Boyd as to whether some of these exposures after 1953 were to Owens-Corning, rather than Owens-Illinois products. No confusion appears on our review of the record, however, and even if only the "three occasions" of exposure to Kaylo were proven, these exposures were daily, and over a period spanning at least three full years, not three isolated exposures
 
 
 [2]
 Plaintiff dropped the asbestosis claim prior to submission to the jury
 
 
 [3]
 The ratio of compensatory damages to loss of consortium damages is obviously irrelevant. Compensatory damages on the wrongful death claim were based upon both retrospective and prospective factors such as the nature and extent of injuries, health and habits, suffering, expenses, earning capacity, and life expectancy, while loss of consortium damages solely address Mrs. Boyd's losses while her husband was ill