**William DAUBERT and Joyce Daubert, individually and as Guardians ad Litem for Jason Daubert, a minor, Plaintiffs,**

v.

**MERRELL DOW PHARMACEUTICALS, INC., et al., Defendants.**

**Michael SCHULLER, Anita De Young, and Anita De Young as Guardian ad Litem for Eric Schuller, Plaintiffs,**

v.

**MERRELL DOW PHARMACEUTICALS, INC., et al., Defendants.**

Civ. Nos. 84–2013–G(IEG),
84–2929–G(IEG).

United States District Court,
S.D. California.

Nov. 1, 1989.

As Modified Dec. 14, 1989.

---

**2.** In fact, there is a case presently pending in Texas in which a CRS competitor is suing American and United.

**571**

See also, 711 F.Supp. 546.

Mary Gillick, San Diego, Cal., Barry Nace of Paulson, Nace, Norwind & Sellinger, Washington, D.C., for plaintiffs.

George Berry, Robert Dickson and Pamela Yates, Santa Monica, Cal., for defendants.

## MEMORANDUM DECISION AND ORDER

GILLIAM, District Judge.

The defendant's motion for summary judgment was scheduled for hearing on October 6, 1989, in Courtroom 7 before the Honorable Earl B. Gilliam. Plaintiffs were represented by Mary Gillick and Barry Nace. George Berry, Robert Dickson and Pamela Yates appeared on behalf of defendant. Having considered the points and authorities and oral argument of counsel, the court issues this memorandum decision and order granting defendant's motion for summary judgment.

### FACTS

This case involves personal injuries sustained by plaintiffs. Infant plaintiffs and their guardians ad litem seek damages from defendant for injuries (limb reduction birth defects) allegedly sustained as a result of the mothers' ingestion of Bendectin during pregnancy. Bendectin is a prescription pharmaceutical product previously manufactured by Merrell Dow, indicated solely for the treatment of nausea and vomiting during pregnancy. Defendant has moved for summary judgment, arguing that plaintiffs have failed to sustain their burden of establishing a genuine issue of material fact regarding causation.

### DISCUSSION

Summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." *Id.* at 323, 106 S.Ct. at 2552 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

In this case the defendant has moved for summary judgment. Plaintiffs, who have the burden of proof by a preponderance of the evidence, oppose the motion. The court must therefore determine "whether a fairminded jury could return a verdict for the plaintiff [based] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–252, 106 S.Ct. at 2511–2512.

The court must view the evidence in a light most favorable to plaintiff, however, "[t]he evidence is insufficient if the strongest inference to be drawn in the plaintiff's favor is that defendant's negligence could *possibly* have been the cause of the accident." *Bieghler v. Kleppe*, 633 F.2d 531, 533 (9th Cir.1980) (emphasis in original) (citing *Neely v. St. Paul Fire & Marine Insurance Co.*, 584 F.2d 341, 345 (9th Cir.1978)). The plaintiff must show that defendant's negligence "was more probably than not the proximate cause of the accident" to defeat summary judgment and take the issue to a jury. *Bieghler* at 533. The court should exclude inadmissible evidence objected to by either party prior to ruling upon the motion. *See, Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir.1980).

Federal Rule of Evidence (FRE) 703, restricts the admissibility of scientific evidence. "A necessary predicate to the admission of scientific evidence is that the principle upon which it is based 'must be sufficiently established to have general acceptance in the field to which it belongs.'" *United States v. Kilgus*, 571 F.2d 508, 510 (9th Cir.1978). Therefore, expert opinion not based on facts or data "of a type reasonably relied upon by experts in the particular field" is not helpful, but instead is confusing or misleading and should therefore be excluded. *See,* Fed.R.Evid. 403. *See also Barrel of Fun, Inc. v. State Farm Fire and Casualty Co.*, 739 F.2d 1028, 1033 (5th Cir.1984) (excluding expert's opinion based on polygraph test). "Whether an expert's opinion has an adequate basis, and whether without it an evidentiary burden has been met, are matters of law for the court to decide." *Richardson v. Richardson–Merrell*, 857 F.2d 823, 829 (D.C.Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989).

There are two schools of thought governing expert testimony in these Bendectin cases, and one seems to be prevailing in the federal courts. Unfortunately for the plaintiffs, the prevailing school of thought warrants summary judgment in this case.

The prevailing school is best exemplified by *Brock v. Merrell Dow Pharmaceuticals*, 874 F.2d 307 (5th Cir.1989), *modified,* 884 F.2d 166 (5th Cir.1989), *rehr'g denied, en banc,* 884 F.2d 167 (5th Cir.1989) where the court held the following:

> We find, in this case, the Brocks' failure to present statistically significant epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case.

*Id.* at 313. The court also noted:

> Hopefully, our decision will have the effect of encouraging district judges faced with medical and epidemiological proof in subsequent toxic tort cases to be especially vigilant in scrutinizing the basis, reasoning, and statistical significance of studies presented by both sides. However, we do not wish this case to stand as a bar to future Bendectin cases in the event that new and statistically significant studies emerge which would give a jury a firmer basis on which to determine the issue of causation.

*Id.* at 315. Several other cases are in accord with this reasoning. *See, Richardson v. Richardson–Merrell, supra; Lynch v. Merrell–National Laboratories*, 830 F.2d 1190 (1st Cir.1987); *Hull v. Merrell Dow Pharmaceuticals, Inc.*, 700 F.Supp. 28 (S.D.Fla.1988); *In re Richardson–Merrell, Inc. "Bendectin" Products Liability Litigation*, 624 F.Supp. 1212 (S.D.Ohio 1985), *aff'd,* 857 F.2d 290 (6th Cir.1988), *cert. denied* —— U.S. ——, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989); *Thompson v. Merrell Dow Pharmaceuticals, Inc.*, 229 N.J.Super. 230, 551 A.2d 177 (1988).

In medical cases like this one, courts must "critically evaluate the reasoning process by which the experts connect data to their conclusions in order for courts to consistently and rationally resolve the disputes before them." *Brock,* 874 F.2d at 310. Absent a scientific understanding of the cause of the birth defects at issue in Bendectin cases, causation may be shown only through reliance upon epidemiological evidence. *See, Richardson v. Richardson–Merrell; Lynch v. Merrell–National Laboratories. See also In re Agent Orange*

*Product Liability Lit.,* 611 F.Supp. 1223 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2nd Cir.1987) (stating that epidemiological studies were "the only useful studies having any bearing on causation" in Agent Orange cases).

In *Richardson,* Dr. Done, the plaintiff's expert, relied upon 1) chemical structure activity analysis, 2) *in vitro* (test tube) studies, 3) *in vivo* (animal teratology) studies, and 4) reanalysis of epidemiology studies. He used the results of these four types of studies to conclude that within a reasonable degree of certainty, Bendectin causes birth defects. The court concluded that Dr. Done's testimony lacked an adequate scientific basis:

> These three types of studies—chemical, *in vitro,* and *in vivo*—cannot furnish a sufficient foundation for a conclusion that Bendectin caused the birth defects at issue in this case. Studies of this kind singly or in combination are not capable of proving causation in human beings in the face of the overwhelming body of contradictory epidemiological evidence.

*Richardson,* 857 F.2d at 830. The court also rejected the reanalysis of the epidemiological studies:

> Dr. Done further admitted that no one who had published work on Bendectin had concluded that there was a statistically significant association between Bendectin and limb reduction defects.... Only by *recalculating* the data was Dr. Done able to obtain what he deems a statistically significant result. Moreover, the studies *rejected* by Dr. Done had been published in peer-reviewed scientific journals, while Dr. Done has neither published his recalculations nor offered them for review.

*Id.* at 831 (emphasis added).

The plaintiffs rely on *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100 (D.C.App.1986) and other cases which basically give more deference to the expert's opinion. *Oxendine* is the leading Bendectin case in this regard, and the appellate court found that Dr. Done had a sufficient foundation for his testimony when he relied upon chemical analyses, animal studies, *in vitro* studies and recalculations of epidemiological studies:

> Dr. Alan Done, appellant's sole causation witness, had testified that no conclusion about Bendectin's effect on humans could be drawn from any of the four types of scientific data upon which he principally relied when each type was considered separately from the others. The [trial] court focused on this fact and concluded that if each type of data, viewed in isolation, was not sufficient to prove that Bendectin caused birth defects, then all of them taken together could not prove it either. In so doing, the trial court erred [by granting defendant's motion for J.N.O.V.].

*Oxendine,* 506 A.2d at 1104. The *Oxendine* court viewed the recalculations of epidemiological studies and the varying conclusions as involving a "classic battle of the experts." *Id.* at 1110. The court refused to find that plaintiffs had provided insufficient evidence to support the jury verdict solely because they had not provided a single original or recalculated epidemiological study which showed a statistically significant association between Bendectin and birth defects. *Id.* at 1107–10.

*Oxendine* is definitely in the minority camp. Although there appears to be no Ninth Circuit authority directly applicable to these Bendectin cases, this court must view the authority developed by three other federal circuit courts in *Brock, Lynch* and *Richardson* as highly persuasive.

In this case, the plaintiffs offer the opinion testimony of eight experts to establish that Bendectin is a teratogen (it causes limb reduction defects generally), and that Bendectin ingested by the mothers during pregnancy caused the limb reduction defects suffered by the infant Daubert and Schuller plaintiffs. Those experts are Dr. Adrian Gross, Dr. Stuart Newman, Dr. Alan K. Done, Dr. Shanna Swan, Dr. Jay Glasser, Dr. Wayne Snodgrass, Dr. Johannes Thiersch and Dr. John Palmer. Plaintiffs have submitted this testimony in the form of affidavits, deposition transcripts, and transcripts from previous trials.

Dr. Adrian Gross is a licensed and accredited veterinarian with experience in pathology and toxicology. *Ealy v. Richardson–Merrell* transcript, Exhibit 26 at pages 650–60. Dr. Gross would testify at trial that to within a reasonable degree of certainty Bendectin is a teratogen. Dr. Gross would base his opinion on animal studies which allegedly show a statistically significant association between Bendectin and doxylamine succinate (a component of Bendectin) and birth defects. *Id.* at pages 834–38.

Dr. Stuart Newman is a specialist in developmental biology. *Ealy* transcript, Exhibit 21 at pages 198–203; *Newman Affidavit* at pages 1–6. Dr. Newman would testify at trial that to within a reasonable degree of certainty "Bendectin is capable of interfering with the development of the limb in the human being and causing birth defects in the developing limb of the human being and that Bendectin is a human teratogen in the normal therapeutic dose." *Newman Affidavit* at page 9. Dr. Newman would base his opinion on *in vitro* studies and the pharmacology aspects of Bendectin. *Id.*

Dr. Alan Done is a medical doctor with specialties in pediatrics, clinical pharmacology and toxicology. *Oxendine v. Richard–Merrell* transcript, Exhibit 31 at page 3. Dr. Done's profferred testimony is unclear from the materials presented, but he apparently would testify that to a reasonable degree of certainty Bendectin is a teratogen. *Id.* at 854. Dr. Done apparently would base his opinion on analyses of the chemical structure and properties of doxylamine succinate animal studies *in vivo*, *in vitro* studies, and various informal and formal human studies, including epidemiological ones. *Id.* at 853.

Dr. Shanna Swan is an epidemiologist and biostatistician practicing in the field of reproductive epidemiology. *Ealy* transcript, Exhibit 12 at pages 3523–27. Dr. Swan would testify that to a reasonable degree of certainty, it is her opinion "that considering all available data that is provided in animal, *in vitro* and epidemiological studies, including the relative risks, the confidence limits and also the power of the studies, that it is more likely than not that Bendectin is, in fact, associated with limb reduction defects." *Swan Affidavit* at page 7. Dr. Swan would base her opinion on "the methodology that is generally and reasonably relied upon by epidemiologists to analyze, study and interpret data that has been collected, published and unpublished in trying to draw opinions concerning whether or not there is a cause and effect relationship between a drug and a birth defect." *Id.* at page 7–8.

Dr. Jay Glasser is a specialist in biostatistics, epidemiology and biometry. *Hill v. Merrell Dow* transcript, Exhibit 32 at pages 4–7; *Glasser Affidavit* at pages 1–4. Dr. Glasser would testify that "Bendectin is within a reasonable degree of epidemiological certainty associated with congenital disorders, including limb defects." *Glasser Affidavit* at page 7. Dr. Glasser would base his opinion on techniques that are generally and reasonably relied upon by biometrists, epidemiologists and biostatisticians. *Id.*

Dr. Wayne Snodgrass is an associate professor of pediatrics and pharmacology and toxicology. *Rudell v. Merrell Dow* transcript, Exhibit 20 at page 2. Dr. Snodgrass would testify that in his opinion Bendectin is a human teratogen. *Id.* at page 4. Dr. Snodgrass would base his opinion on results of various studies in several disciplines including pharmacology, toxicology, *in vitro* studies, animal studies and human studies. *Id.*

Dr. Johannes Thiersch is a specialist in pathology and pharmacology. *Thiersch Curriculum Vitae*, Exhibit 18. Dr. Thiersch would testify that the chemical composition and physiological activity of a drug are of great interest and importance in determining whether a drug is a teratogen. *Ealy v. Richardson–Merrell* transcript, Exhibit 22 at page 1596.

Dr. John Palmer is a professor of pharmacology. *Palmer Affidavit* at pages 1–4. Dr. Palmer would testify that in his opinion to a reasonable medical and scientific certainty Bendectin is a teratogen. *Id.* at page 7. Dr. Palmer would base his opinion

on the pharmacological data, animal studies data, *in vitro* studies data, epidemiological data and other human data. *Id.* at pages 5–7. Dr. Palmer would also testify that he has examined the medical records of the plaintiff children and to a reasonable degree of medical certainty Bendectin was taken at a period of time such as to effect their development and it indeed caused their limb defects. *Id.* at pages 7–8.

▇▇▇▇ The federal courts have held that epidemiological studies are the most reliable evidence of causation in this area. Accordingly, expert opinion which is not based on epidemiological evidence is not admissible to establish causation because it lacks the sufficient foundation necessary under FRE 703. *See, Brock,* 874 F.2d at 311–15; *Richardson,* 857 F.2d at 829–32; *Lynch,* 830 F.2d at 1194. Therefore, expert testimony concluding that Bendectin causes limb reduction defects which is generally based upon *in vitro* studies, chemical structure analyses and animal studies is insufficient to take the issue to the jury. The plaintiffs' experts must be competent to testify that some epidemiological study or recalculation shows a statistically significant relationship between the ingestion of Bendectin and birth defects and that this study forms the basis of their opinion. *Id.* In this case, the plaintiffs have failed to live up to the *Brock* mandate to provide some epidemiological evidence to support their claim that Bendectin is a teratogen. *Brock,* 874 F.2d at 315.

The defendants have introduced evidence that no epidemiological study ever performed has concluded that the use of Bendectin by pregnant women has a statistically significant association to birth defects in those women's children. *Report on the Safety of Bendectin/Diclectin for Use in the Management of Nausea and Vomiting of Pregnancy,* Exhibit J, Defendant's Reply to Affidavits of Plaintiff's Experts Submitted in Opposition to Defendant's Motion for Summary Judgment, at page 2 ("Controlled studies involving over 130,000 patients have not demonstrated any reproducible or consistent association of birth defects with Bendectin exposure. In fact, the results of the epidemiological studies are just what one might expect of an agent without reproductive or teratogenic risks."). *See also Statement of Steven H. Lamm,* Exhibit A, Defendant's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment on the Issue of Causation at page 1 (after reviewing the world's literature on Bendectin and human birth defects, the studies "showed no difference in the risk of birth defects between those infants whose mothers had taken Bendectin during the first trimester of pregnancy and those infants whose mothers had not"). The plaintiffs' experts agree that none of the *published* studies show a statistically significant association between the use of Bendectin and birth defects. *See, e.g., Hill v. Merrell Dow Deposition of Jay H. Glasser,* Exhibit J, Defendant's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment on the Issue of Causation at page 164.

The plaintiffs argue that the absence of statistically significant epidemiological studies does not disprove the fact that Bendectin causes limb reduction defects. *See, e.g.,* Plaintiffs' Opposition to Defendant's Motion for Summary Judgment at 20–27; *Affidavit of Shanna Helen Swan* at pages 4–6. However, this argument directly contradicts the holdings of *Brock, Richardson* and *Lynch. See, supra.* The plaintiffs have the burden of proof, and they must come forward with statistically significant epidemiological evidence. The plaintiffs claim that Dr. Gross performed a new epidemiological study on Bendectin, but this is false. He simply recalculated a previously published study and tried to show that there actually was a significant relation between Bendectin and birth defects. *Letter to Thomas H. Bleakley,* Exhibit 40. Dr. Gross' "study" was apparently never published or subjected to peer review, and nowhere does it state that Bendectin sales increased the relative risk of limb reduction defects to a level significantly above 1.0 with a confidence interval that did not include unity. Dr. Gross alleges that this "study" shows "a statistically significant association that is highly significant" (Affi-

davit at page 11), but his allegation and this evidence is insufficient to take this matter to a jury. *See, Brock*, 874 F.2d at 312–13. Similarly, Dr. Swan's unsupported allegation that the Jick data "statistically significantly associates Bendectin and limb defects" (Affidavit at page 7) is similarly insufficient.

The court feels that the strongest inference to be drawn for plaintiffs based on the epidemiological evidence is that Bendectin could *possibly* have caused plaintiffs' injuries, therefore summary judgment is proper against them. *See, Bieghler v. Kleppe, supra*, 633 F.2d at 533. The court finds that there are no genuine issues of material fact with respect to causation and finds for the defendant on all causes of action.

IT IS SO ORDERED.