**Ronnie LEE, et al., Plaintiffs,**

v.

**RICHARDSON–MERRELL, INC., Defendant.**

No. 84–2228 GB.

United States District Court, W.D. Tennessee, W.D.

Jan. 30, 1991.

_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GIBBONS, District Judge.

Before the court is the motion for summary judgment of defendant Merrell Dow Pharmaceutical Inc. (formerly Richardson–Merrell, Inc.). Plaintiffs Ronnie and Evonne Mackey Lee sue on behalf of their minor child, Michael Lee, to recover damages for birth defects that allegedly resulted from Mrs. Lee's ingestion of the anti-nausea prescription drug Bendectin, manufactured by defendant,[1] while she was pregnant with Michael. The issue raised by the summary judgment motion is whether plaintiff's evidence is sufficient to create a genuine issue of material fact on the causation issue.

Plaintiffs allege that around September 21, 1973, Mrs. Lee, who was about seven weeks pregnant, took Bendectin. Michael Lee was born on March 27, 1974, with limb defects—shortness of his fingers, "web-

---

1. Defendant manufactured and marketed Bendectin from 1956 to 1983. In 1983, faced with costly litigation involving use of the drug, it voluntarily withdrew the drug from the market.

bing" and generalized smallness of his hands. Plaintiffs allege that Mrs. Lee ingested no other drugs during this period of time and that no other substance caused or contributed to Michael Lee's limb defects. In addition, plaintiffs allege that Michael's defects are not genetically related. Finally, plaintiffs allege that Mrs. Lee's ingestion of Bendectin, at the point in pregnancy that the extremities are beginning to develop, was the proximate cause of Michael's limb defects.

Both plaintiffs and defendant have submitted expert opinion evidence to the court in the form of affidavits, depositions, and prior trial testimony. Several of plaintiffs' experts offer an opinion that the ingestion of Bendectin by Mrs. Lee caused Michael Lee's birth defects. The issue therefore is not whether plaintiffs can present any expert proof on the issue of causation. Rather, the issue is whether plaintiffs' expert proof on causation creates a genuine issue of material fact, in view of the bases for the opinions of plaintiffs' experts.

Defendant asserts that human epidemiology studies comprise the only competent evidence on the question of Bendectin's teratogenicity, or ability to cause birth defects. More than thirty such studies have found no causal connection between Bendectin and birth defects. Defendant argues that plaintiffs' proffered expert testimony is inadmissible under Federal Rules of Evidence 702 and 703, because the opinions of plaintiffs' experts are not "in conformity to a generally accepted explanatory theory," *United States v. Kozminski*, 821 F.2d 1186, 1201 (6th Cir.1987), and are not based on facts or data "of a type reasonably relied upon by experts in the particular field." Fed.R.Evid. 703. Plaintiffs' experts base their opinions on *in vivo* testing in animals, *in vitro* testing on isolated cells and tissue, and human data (which includes criticism and reanalysis of various epidemiological studies submitted by defendant and additional studies).

Federal Rule of Civil Procedure 56 provides that a motion for summary judgment shall be granted if, based on the record as a whole, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In a motion for summary judgment, the moving party bears the burden of clearly establishing the non-existence of any genuine issue of material fact, and the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the non-moving party. *Kochins v. Linden–Alimack, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986).

According to Rule 56(e) of the Federal Rules of Civil Procedure, when confronted with a properly supported motion for summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The party opposing summary judgment "must do more than simply show there is some metaphysical doubt as to the material facts," *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), but instead must present "concrete evidence supporting its claims and establishing the existence of a genuine issue of fact." *Cloverdale Equipment v. Simon Aerials Inc.*, 869 F.2d 934, 937 (6th Cir. 1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

Federal Rule of Evidence 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." The United States Court of Appeals for the Sixth Circuit in *United States v. Green,* 548 F.2d 1261 (6th Cir.1977), enunciated the standard for admissibility of expert testimony under Rule 702: (1) a qualified expert must be offered; (2) the expert must testify on a proper subject; (3) he must testify in conformity to a generally accepted explanatory theory; and (4) the probative value of the testimony must outweigh any prejudicial effect. *Id.* at 1268.

This standard was reaffirmed by the Sixth Circuit in the case of *United States v. Kozminski,* 821 F.2d 1186 (6th Cir.1987). *See also Novak v. United States,* 865 F.2d 718, 721 (6th Cir.1989) (applying test in a civil action). The *Kozminski* court elaborated that the third element of the test, "conformity to a generally accepted explanatory theory," must be firmly anchored in sound, reliable, and sufficiently accurate scientific principles. *Id.* at 1201. The court stated that scientific explanatory theory must have: (a) received at least some exposure within the scientific peerage to which it belongs; (b) been subjected to peer evaluation to determine its scientific validity and reliability; and (c) achieved general acceptance within the scientific community to which it belongs. *Id.* at 1201.

Rule 703 requires that the data relied upon in the formulation of an expert opinion be of "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. Thus, if expert opinion is not based upon data of "a type reasonably

relied upon by experts in the particular field," the expert fails to be helpful, but, rather, is confusing or misleading. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 727 F.Supp. 570, 572 (S.D.Cal.1989). "Whether an expert's opinion has an adequate basis, and whether without it an evidentiary burden has been met, are matters of law for the court to decide." *Richardson v. Richardson–Merrell,* 649 F.Supp. 799 (D.D.C.1986), *aff'd,* 857 F.2d 823, 829 (D.C.Cir.1988), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989).

The first category of data on which plaintiff's experts rely is *in vivo* (animal) studies. In this category are opinions reflected in the affidavits of Drs. Adrian Gross, Frederick Crescitelli and John Palmer. Plaintiffs' Response, p. 53. Dr. Gross, a veterinarian, states that, based upon animal studies, the doxylamine succinate component of Bendectin is in fact a teratogen.[2] Affidavit of Adrian Gross filed in *Daubert,* Plaintiffs' Attachment 41. Dr. Crescitelli, a biologist, also states that doxylamine succinate is a teratogen. Affidavit of Frederick Crescitelli filed in *Daubert,* Plaintiffs' Attachment 39. Dr. Palmer, a physician and pharmacology professor, avers that, based upon animal studies, *in vitro* studies, and pharmacological data, Bendectin is a teratogen. Affidavit of John Palmer filed in *Elkins,* Plaintiffs' Attachment 43. Plaintiffs also assert, without accompanying evidence, that several other experts would testify similarly at trial.

Second, plaintiffs rely on *in vitro* studies to support their position. *In vitro* studies are studies conducted in test tubes or petri dishes. Plaintiffs' experts relying on this type of study are Drs. Stuart Newman, Shanna Swan, Crescitelli and Palmer. Plaintiffs' Response, p. 57. Dr. Newman, a developmental biologist, asserts in his affidavit and in prior trial testimony that, based upon *in vitro* studies, Bendectin is a teratogen. Affidavit of Stuart Newman filed in *Elkins,* Plaintiffs' Attachment 42; trial testimony of Newman in *Ealy,* Plaintiffs' Attachment 18.

2. Bendectin has three components: dicyclomine hydrochloride, an antispasmodic drug; doxyla-
mine succinate, an antihistamine; and pyridoxine (vitamin B6).

Dr. Swan, an epidemiologist and biostatistician practicing in the field of reproductive epidemiology, states that to a reasonable degree of certainty, considering all available data provided in animal, *in vitro,* and epidemiological studies, Bendectin is associated with limb reduction defects. Affidavit of Shanna Swan filed in *Daubert,* Plaintiffs' Attachment 40. Dr. Swan bases her opinion on "the methodology that is generally and reasonably relied upon by epidemiologist to analyze, study and interpret data that has been collected, published and unpublished in trying to draw opinions concerning whether or not there is a cause and effect relationship between a drug and a birth defect." *Id.*

Finally, plaintiffs offer some of their own "relevant human data" on the teratogenicity of Bendectin. Plaintiffs direct the court's attention to the affidavits of Drs. Jay Glasser and Swan and to their prior testimony in similar litigation. *See* Plaintiffs' Attachments 10, 29, 38, and 40. Dr. Glasser, a specialist in biostatistics, epidemiology and biometry, asserts that Bendectin is associated with congenital disorders, including limb defects, within a reasonable degree of epidemiological certainty. Affidavit of Jay Glasser filed in *Daubert,* Plaintiffs' Attachment 38. Dr. Glasser states that his opinion is based on techniques that are generally and reasonably relied upon by biometrists, epidemiologist and biostatisticians. *Id.* Plaintiffs also rely on various studies and articles. *See* discussion *infra* at 1031.

Based on these three categories of evidence, plaintiffs argue that their experts have the requisite "knowledge, skill, training, education, [and] experience" and that "the data that they were relying on was of the type that was generally and reasonably relied upon by experts in the particular field." Response at 30. The court finds, however, that plaintiffs' expert evidence fails to meet the test for admissibility enunciated by the Sixth Circuit in *Green* and *Kozminski* or the requirements of Rule 703, in view of the overwhelming contrary epidemiological data supporting the non-teratogenicity of Bendectin. Given the extensive human studies of Bendectin that fail to establish that Bendectin can cause birth defects, experts cannot reasonably rely on *in vivo* and *in vitro* studies that support a contrary finding. Nor can opinions based on *in vivo* and *in vitro* studies be considered "in conformity to a generally accepted explanatory theory," in view of the overwhelming evidence from human studies.

The deficiencies of plaintiffs' evidence based on *in vivo* and *in vitro* studies are apparent, when compared specifically with the data on which the opinions of defendant's experts are based. The opinions of defendant's experts are based on a large number of studies—more than thirty. Data on more than 130,000 women and children was considered in the studies. No study has found a causal association between Bendectin and birth defects.

In addition, the Food and Drug Administration's (FDA) constant reexamination of the safety of Bendectin has reaffirmed Bendectin's safety. A 1979 FDA TALK PAPER stated:

> Because of the extensive use of this drug, FDA over the years has carefully monitored it, with a particular view to its effect on the fetus. In the studies to date, there is no evidence that Bendectin is associated with an increased risk of birth defects.

The FDA again affirmed Bendectin's safety in a 1980 TALK PAPER, and in a 1982 TALK PAPER the FDA, in response to a then recently released animal study, concluded:

> The significance of both the rat and monkey studies, even if reproducible, would be debatable in view of the more pertinent human epidemiologic data that have not, to date, produced convincing evidence that Bendectin causes diaphragmatic hernias or other birth defects in the offspring of women treated with Bendectin.

Plaintiffs' "relevant human data" comes no closer to meeting the test for admissibility than the opinions based on *in vivo* and *in vitro* studies. To the extent that this data consists of the affidavits of experts, these affidavits are based on data on which the experts could not "reasonably rely," and the opinions of the experts do not

conform to a "generally accepted explanatory theory." The remainder of this data, consisting of articles and studies, simply fails to support plaintiffs' position. For example, plaintiffs rely on an article from the *Canadian Medical Association Journal* by a P. Banister.[3] Referring to this article, plaintiffs represent that "in a study involving 29 mothers who used drugs during a pregnancy and given birth to a child with limb defects, three had used Bendectin, all the first trimester." Examination of the Banister study in fact reveals that the study was unable to "establish the etiology of the anomalies", and that "no currently recognized factor has been identified for the majority of these cases and that there is a great need for further detailed investigation of possible etiological factors." Banister Article, Plaintiffs' Attachment 30.

Plaintiffs also refer to a study published by the Birmingham Research Units of the Royal College of General Practitioners.[4] Although plaintiffs state that the data compiled in the study showed a statistical association between antihistamines and birth defects, a closer look at the article reveals that "[i]n a prospective study involving 9,000 pregnant women, no cause-and-effect relationships have been established between morbidity recorded or drugs taken during early pregnancy and subsequent congenital malformations. It is also very unlikely that any drug in common use in 1964 had even a minor influence on congenital malformations recognizable, in the first six weeks of life." Birmingham Article, Plaintiffs' Attachment 30.

Plaintiffs submitted thirteen additional articles involving human data, not one of which supports plaintiffs' theory that Bendectin causes limb defects. There is simply no epidemiological evidence supporting plaintiffs' theory of causation.

This court's conclusion about the opinions of plaintiffs' experts is consistent with that of many other courts which have considered this same issue in Bendectin cases. The First, Fifth and D.C. Circuit Courts of Appeals and numerous district courts, including the United States District Court for the Eastern District of Kentucky, have held that there is insufficient admissible evidence that Bendectin can cause birth defects to submit the issue to a jury.

In *Lynch v. Merrell–National Laboratories*, 646 F.Supp. 856 (D.Mass.1986), *aff'd*, 830 F.2d 1190 (1st Cir.1987), plaintiffs relied upon *in vivo* studies to support their position of Bendectin's teratogenicity. In granting summary judgment for defendants, the district court found the animal studies lacking probative value and therefore inadmissible. *Id.* at 866. In *Lynch*, plaintiff's own expert, Dr. Alan Done, admitted that the fact that Bendectin may be teratogenic in a species of animal does not necessarily mean it will be teratogenic in humans. *Id.* at 865. Dr. Michael Melnick had testified that, on the basis of animal studies, "one can only speak of birth defects in the animal—in the animal one has studied." *Id.* The *Lynch* court also found it difficult to extrapolate findings from animal studies to human studies because of the large doses used in the animal studies. *Id.* Dr. William Scott had testified that almost any substance can be shown to be teratogenic at some dose in some species. *Id.*

The *Lynch* court also commented on the evidence of *in vitro* studies submitted to it.

> The *in vitro* studies suffer from the same deficiencies as the *in vivo* animal studies, they are performed on other biological species and at doses far in excess of the human therapeutic dose. This court also cannot find, pursuant to Rule 703, that such studies are "of a type reasonably relied upon by experts in the particular field."

*Lynch*, 646 F.Supp. at 866.

The First Circuit affirmed the lower court's ruling that plaintiff failed to present sufficient proof of causation to per-

**3.** Banister, P., *Congenital Malformations: Preliminary Report of an Investigation of Reduction Deformities of the Limbs, Triggered by a Pilot Surveillance System,* Cand.Med.Ass.J. 103:466–72 (1970).

**4.** Birmingham Research Unit of the Royal College of General Practitioners, *Morbidity and Drugs in Pregnancy,* Journal of the Royal College of General Practitioners, 25, 631–645 (1975).

mit a reasonable trier of fact to conclude that Bendectin had caused the birth defect of the plaintiff. The court stated that *in vivo* studies, *in vitro* studies, and the study of "analogous" chemicals, singly or in combination, "do not have the capability of proving causation in human beings in the absence of any confirmatory epidemiological data." *Lynch,* 830 F.2d at 1194.

The Fifth Circuit, in *Brock v. Merrell Dow,* 874 F.2d 307, *mod.* 884 F.2d 166 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1989), reversed a jury verdict for plaintiffs, holding that the lack of conclusive epidemiological proof was fatal to the plaintiffs' case. Plaintiffs' experts in *Brock* included Drs. Newman, Glasser and Thiersch, all of whom are plaintiffs' experts in the present case. With regard to animal studies the *Brock* court found:

> Other plaintiffs' experts conducted animal tests and reanalyses of previously performed animal tests. Drs. Thiersch and Glasser both reanalyzed results of previous studies on animals. Both admitted that the results of their animal studies are difficult to extrapolate to humans. Dr. Thiersch admitted in his deposition that one must rely, in part, on epidemiological studies to determine whether a substance is toxic in humans. Similarly Dr. Glasser admitted that the only way to tell whether a substance is teratogenic in humans is to look to the human experience.

*Id.* at 314.

One of the most persuasive opinions with regard to plaintiffs' evidence in a Bendectin case comes from *Richardson,* where the D.C. Circuit affirmed the trial judge's holding that the evidence presented at trial was insufficient to support the jury's determination that Bendectin caused the minor-plaintiff's limb reduction defects. With regard to the probative value of the types of data relied upon by plaintiff's expert, Dr. Alan Done, the court stated:

> These three types of studies then—chemical, *in vitro,* and *in vivo*—cannot furnish a sufficient foundation for a conclusion that Bendectin caused the birth defects at issue in this case. Studies of this kind, singly or in combination, are not capable of proving causation in human beings in the face of the overwhelming body of contradictory epidemiological evidence. Perhaps mindful of this, the last type of evidence considered by Dr. Done consisted of epidemiological studies. When such studies are available and relevant, and particularly when they are numerous and span a significant period of time, they assume a very important role in determinations of questions of causation.

*Richardson,* 857 F.2d at 830. In rejecting Dr. Done's epidemiological data, the court stated:

> Dr. Done further admitted that no one who has published work on Bendectin has concluded that there is a statistically significant association between Bendectin and limb reduction defects of the type at issue in this case. Only by recalculating the data was Dr. Done able to obtain what he deems a statistically significant result. Moreover, the studies rejected by Dr. Done had been published in peer-reviewed scientific journals, while Dr. Done has neither published his recalculations nor offered them for peer review.

*Id.* at 831.

Recently, in a well-reasoned order Judge Eugene Siler, Jr., of the United States District Court for the Eastern District of Kentucky, in the case of *Gary Turpin, et al. v. Merrell Dow Pharmaceuticals Inc.,* 736 F.Supp. 737 (1990). Defendant's Exhibit 10, p. 17, granted summary judgment in favor of defendant Merrell–Dow. The court stated, "[i]n light of over thirty (30) epidemiological studies concluding that no statistically significant association exists between Bendectin and human birth defects, and after closely scrutinizing the bases of the proffered opinions of the plaintiffs' experts, this court concludes that the testimony is inadmissible under Fed. R.Evid. 703." *Id.* In finding plaintiffs' evidence to be inadmissible the court applied the four part test set out in *Kozminski* and concluded:

> The plaintiffs' experts' testimony while satisfying three prongs of the test, fails the third prong in that their testimony is not in conformity with a generally accepted explanatory theory in light of the

overwhelming epidemiological data governing the non-teratogenicity of Bendectin.

*Id.* Plaintiffs' experts in *Turpin* included Drs. Thiersch, Swan, Newman, Gross, Glasser, Crescitelli, and Palmer, all of whom are plaintiffs' experts in the instant litigation.

Quite obviously, the affidavits and former trial testimony of experts submitted by plaintiffs in this case were considered in other cases. Substantially identical testimony has been rejected in *Lynch* (Dr. Swan), *Brock* (Drs. Newman, Glasser and Thiersch), *Ealy* (Drs. Gross, Newman, Swan, Thiersch), and most recently *Turpin* (Drs. Thiersch, Swan, Newman, Crescitelli, Gross, Glasser, and Palmer). Other courts have examined plaintiffs' evidence in the context of a motion for summary judgment or motion for judgment notwithstanding the verdict and found it to be insufficient. *See e.g., Hull v. Merrell Dow Pharmaceuticals Inc.,* 700 F.Supp. 28 (S.D.Fla.1988); *DePyper v. Navaro,* No. 83–303–467NM (Civ.Ct. Wayne Co., Mich. March 10, 1990); *Koller v. Richardson–Merrell, Inc.,* No. 80–1258 (June 30, 1989, D.D.C.) and *Ambrosini v. Richardson–Merrell, Inc.,* No. 86–278 (June 30, 1989, D.D.C.) (Defendant's Exhibits 17 and 18) (granting summary judgment for defendant relying on *Richardson*); *DeLuca v. Merrell Dow Pharmaceutical Inc.,* 131 F.R.D. 71 (D.N.J.1989) (Defendant's Exhibit 19); *Monahan v. Merrell–National Laboratories,* No. 83–3108–WP, 1987 WL 90269 (December 18, 1987, D.Mass.) (Defendant's Exhibit 20); *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 727 F.Supp. 570 (S.D.Cal. 1989).[5]

The court finds that plaintiffs' expert evidence would not be admissible at trial and therefore cannot be considered in connection with the motion for summary judgment. Fed.R.Civ.P. 56(e). Therefore, plaintiffs have failed to offer sufficient evidence to create a genuine issue of material fact on the causation issue. The motion for summary judgment is granted, and judgment shall be entered for defendant.

IT IS SO ORDERED.

---

**5.** In support of plaintiffs' position are *Oxendine v. Merrell–Dow,* 506 A.2d 1100 (D.C.1986) (*Oxendine I*) and *Oxendine v. Merrell–Dow,* 563 A.2d 330 (D.C.1989) (*Oxendine II*). *Oxendine* allowed the introduction of expert opinion viewing the recalculations of epidemiological studies and the varying conclusions as involving a "classic battle of the experts". *Oxendine,* 506 A.2d at 1110. The D.C. Circuit, however, specifically rejected the reasoning in *Oxendine,* noting the differences between state and federal rules of evidence regarding admissibility. *Richardson,* 857 F.2d at 825 n. 9.

Plaintiffs cite other authority in their response to defendant's motion to dismiss (Response at 34–41). On occasion, however, they fail to give a full picture of this authority. For example, in their response plaintiffs cite *Ealy v. Richardson–Merrell, Inc.* and leave the court with the impression that, after a verdict for plaintiffs, the trial judge denied defendant's motion for judgment notwithstanding the verdict. Although this is true, plaintiffs fail to inform the court that the D.C. Circuit reversed the lower court on the issue of liability, holding plaintiffs' evidence inadmissible under Fed.R.Evid. 703. *Ealy v. Richardson–Merrell, Inc.,* 897 F.2d 1159 (D.C.Cir.1990).